Foley, Judge: Respondent determined deficiencies of $14,931,159, $13,409,628, $7,461,039, $5,095,222, and $2,828,861 relating, respectively, to Rent-A-Center, Inc. (RAC), and its subsidiaries’ 2003,[1] 2004, 2005, 2006, and 2007 (years in issue) consolidated Federal income tax returns. The issue for decision is whether payments to Legacy Insurance Co., Ltd. (Legacy), were deductible, pursuant to section 162,[2] as insurance expenses. FINDINGS OF FACT RAC, a publicly traded Delaware corporation, is the parent of a group of approximately 15 affiliated subsidiaries (collectively, petitioner). During the years in issue, petitioner was the largest domestic rent-to-own company. Through stores owned and operated by RAC’s subsidiaries, petitioner rented, sold, and delivered home electronics, furniture, and appliances. The stores were in all 50 States, the District of Columbia, Puerto Rico, and Canada. From 1993 through 2002, petitioner’s company-owned stores increased from 27 to 2,623. During the years in issue, RAC’s subsidiaries owned between 2,623 and 3,081 stores; had between 14,300 and 19,740 employees; and operated between 7,143 and 8,027 insured vehicles. I. Petitioner’s Insurance Program In 2001, American Insurance Group (AIG), in response to a claim against RAC’s directors and officers (D&O), withdrew a previous offer to renew RAC’s D&O insurance policy. To address this problem, RAC engaged Aon Risk Consultants, Inc. (Aon), which convinced AIG to renew the policy. Impressed with Aon’s insurance expertise and concerned about its growing insurance costs, petitioner engaged Aon to analyze risk management practices and to broker workers’ compensation, automobile, and general liability insurance. With Aon’s assistance, petitioner developed a risk management department and improved its loss prevention program. Prior to August 2002, Travelers Insurance Co. (Travelers) provided petitioner’s workers’ compensation, automobile, and general liability coverage through bundled policies. Pursuant to a bundled policy, an insurer provides coverage and controls the claims administration process (i.e., investigating, evaluating, and paying claims). Travelers paid claims as they arose and withdrew amounts from petitioner’s bank account to reimburse itself for any claims less than or equal to petitioner’s deductible (i.e., a portion of an insured claim for which the insured is responsible). Pursuant to a predetermined formula, each store was allocated, and was responsible for paying, a portion of Travelers’ premium costs. In 2001, after receiving a $3 million invoice from Travelers for “claim handling fees”, petitioner became dissatisfied with the cost and inefficiency associated with its bundled policies. On August 5, 2002, petitioner, with the assistance of Aon, obtained unbundled workers’ compensation, automobile, and general liability policies from Discover Re. Pursuant to an unbundled policy, an insurer provides coverage and a third-party administrator manages the claims administration process. Discover Re underwrote the policies; multiple insurers provided coverage;[3] and Specialty Risk Services, Inc. (SRS),[4] a third-party administrator, evaluated and paid claims. Petitioner and its staff of licensed adjusters had access to SRS’ claims management system and monitored SRS to ensure the proper handling of claims. This arrangement gave petitioner greater control over the claims administration process. Petitioner, pursuant to the Discover Re policies’ deductibles, was liable for a specific amount of each claim against its workers’ compensation, automobile, and general liability policies (e.g., pursuant to its 2002 workers’ compensation policy, petitioner was liable for the first $350,000 of each claim). Petitioner’s retention of a portion of the risk resulted in lower premiums. II. Legacy’s Inception Between 1993 and 2002, petitioner rapidly expanded and became increasingly concerned about its growing risk management costs. In 2002, after analyzing petitioner’s insurance program, Aon suggested that petitioner form a wholly owned insurance company (i.e., a captive). Aon representatives informed David Glasgow, petitioner’s director of risk management, about the financial and nonfinancial benefits of forming a captive. Aon convincingly explained that a captive could help petitioner reduce its costs, improve efficiency, obtain otherwise unavailable coverage, and provide accountability and transparency. Mr. Glasgow presented the proposal to petitioner’s senior management, who concurred with Mr. Glasgow’s recommendation to further explore the formation of a captive. Petitioner’s senior management directed Aon to conduct a feasibility study (i.e., relying on petitioner’s workers’ compensation, automobile, and general liability loss data) and to prepare loss forecasts and actuarial studies. Petitioner engaged KPMG to analyze the feasibility study, review tax considerations, and prepare financial projections. Aon, in the feasibility study, recommended that the captive be capitalized with no less than $8.8 million. Before deciding where to incorporate the captive, RAC analyzed projected financial data and reviewed multiple locations. On December 11, 2002, RAC incorporated, and capitalized with $9.9 million, [5] Legacy, a wholly owned Bermudian subsidiary.[6] Legacy opened an account with Bank of N.T. Butterfield and Son, Ltd., and, on December 20, 2002, filed a class 1 insurance company registration application with the Bermuda Monetary Authority (BMA), which regulated Bermuda’s financial services sector. A class 1 insurer may insure only the risk of its shareholders and affiliates; must be capitalized with at least $120,000; and must meet a minimum solvency margin calculated by reference to the insurer’s net premiums, general business assets,[7] and general business liabilities. See Insurance Act, 1978, secs. 4B, 6, Appleby (2008) (Berm.); Insurance Returns and Solvency Regulations, 1980, Appleby, Reg. 10(1), Schedule I, Figure B (Berm.). During the years in issue, the BMA had the authority to modify prescribed requirements through both prospective and retroactive directives for special allowances. See Insurance Act, 1978, sec. 56. Legacy planned to insure petitioner’s liabilities for the period beginning in 2002 and ending December 31, 2003 (proposed period). Aon informed petitioner that coverage provided by unrelated insurers would be more costly than Aon’s estimate of Legacy’s premiums and that some insurers would not be willing to offer coverage. In response to a quote request, Discover Re stated that it was not in the market to provide the coverage Legacy contemplated. Discover Re estimated, however, that its premium (i.e., if it were to write one relating to the proposed period) would be approximately $3 million more than Legacy’s. III. Petitioner’s Policies During the years in issue, petitioner obtained unbundled workers’ compensation, automobile, and general liability policies from Discover Re. Pursuant to these policies, Discover Re provided petitioner with coverage above a predetermined threshold relating to each line of coverage. In addition, Legacy wrote policies that covered petitioner’s workers’ compensation, automobile, and general liability claims below the Discover Re threshold. Petitioner, depending on the amount of a covered loss, could seek payment from Legacy, Discover Re, or both companies. The annual premium Legacy charged petitioner was actuarially determined using Aon loss forecasts and was allocated to each RAC subsidiary that owned covered stores. RAC was a listed policyholder pursuant to the Legacy policies. No premium was attributable to RAC, however, because it did not own stores, have employees, or operate vehicles. RAC paid the premiums relating to each policy,[8] estimated petitioner’s total insurance costs (i.e., Legacy policies, Discover Re policies, third-party administrator fees, overhead, etc.), and established a monthly rate relating to each store’s portion of these costs. The monthly rate was based on three factors: each store’s payroll, each store’s number of vehicles, and the total number of stores. At the end of each year, RAC adjusted the allocations to ensure that its subsidiaries recognized their actual insurance costs. SRS administered all claims relating to petitioner’s workers’ compensation, automobile, and general liability coverage. During the years in issue, the terms of Legacy’s coverage varied, Legacy progressively covered greater amounts of petitioner’s risk, and Legacy did not receive premiums from any unrelated entity. From December 31, 2002, through December 30, 2007, Legacy earned net underwriting income of $28,761,402. See infra p. 10. A. Legacy’s Deferred Tax Assets Pursuant to the Legacy policies, coverage began on December 31 of each year. Because petitioner was a calendar year accrual method taxpayer, these policies created temporary timing differences between income recognized for tax purposes and income recognized for financial accounting (book) purposes.[9] For example, on December 31, 2002, when Legacy’s second policy became effective, Legacy recognized, for tax purposes, the full amount of the premium (i.e., $42,800,300) relating to the taxable year ending December 31, 2002. See sec. 832(b)(4). For book purposes, however, Legacy in 2002 recognized only 1/365 of the premium (i.e., $117,261), and the remaining $42,683,039 constituted a reserve. This timing difference created a deferred tax asset (DTA) because in 2002 Legacy “prepaid” its tax liability relating to income it recognized, for book purposes, in 2003. Each day Legacy recognized a portion of its premium income (i.e., $117,261) for book purposes and reduced its reserve by the same amount. On December 30, 2003, the reserve was fully depleted. Upon the issuance of a new policy on December 31, 2003, a new DTA was created because Legacy recognized, for tax purposes, in 2003 the full amount of the premium; a corresponding tax liability was incurred; the premium reserve increased; and most of the premium income attributable to the 2003 policy was recognizable, for book purposes, in 2004. 1. Bermuda’s Minimum Solvency Margin Requirement Pursuant to the Bermuda Insurance Act, an insurance company must maintain a minimum solvency margin. See Insurance Act, 1978, sec. 6. More specifically, a class 1 insurer’s general business assets must exceed its general business liabilities by the greatest of: $120,000; 10% of the insurer’s loss and loss expense provisions plus other insurance reserves; or 20% of the first $6 million of net premiums plus 10% of the net premiums which exceed $6 million. See Insurance Returns and Solvency Regulations, 1980, Appleby, Reg. 10(1), Schedule I, Figure B. DTAs generally may be treated as general business assets only with the BMA’s permission. 2. Legacy Receives Permission To Treat DTAs as General Business Assets Through 2003 In the minimum solvency margin calculation set forth in its insurance company registration application, Legacy treated DTAs as general business assets. On March 11, 2003, Legacy petitioned the BMA. for the requisite permission to do so. The following letter from RAC accompanied the request: We write to confirm, to you that Rent-A-Center, Inc., * * * will guarantee the payment to Legacy Insurance Company, Ltd. (the “Company”), * * * of all amounts reflected on the projected balance sheets of the Company previously delivered to you as deferred tax assets arising from timing differences in the amounts of taxes payable for tax and financial accounting purposes. This guaranty of payment will take effect in the event of any change in tax laws that would require recognition of an impairment of the deferred tax asset, and will be effective to the extent of the amount of the impairment. On March 13, 2003, the BMA granted Legacy permission to treat DTAs as general business assets on its statutory balance sheet through December 31, 2003.[10] The BMA also informed Legacy that from December 31, 2002, through March 13, 2003, it “wrote insurance business without being in receipt of its Certificate of Registration and was therefore in violation of the [Bermuda Insurance] Act as it engaged in insurance business without a license.” Despite this violation, the BMA registered Legacy as a class 1 insurer effective December 20, 2002 (i.e., the date Legacy filed its insurance registration request and before it issued policies relating to the years in issue). 3. The Parental Guaranty: Facilitating the Treatment of DTAs as General Business Assets Through 2006 In response to the recurring DTA issue, Legacy requested that RAC guarantee DTAs relating to subsequent years. On September 17, 2003, RAC’s board of directors authorized the execution of a guaranty of “the obligations of Legacy to comply with the laws of Bermuda.” On the same day, RAC’s chairman and chief executive officer executed a parental guaranty and sent it to Legacy’s board of directors. The parental guaranty provided: The undersigned, Rent-A-Center, Inc. a Delaware corporation (“Rent-A-Center”) is sole owner of 100% of the issued and outstanding shares in your share capital and as such DOES HEREBY GUARANTEE financial support for you, Legacy Insurance Co., Ltd., * * * and for your business, as more particularly set out below, which is to say: Under the [Bermuda] Insurance Act * * * and related Regulations (the “Act”), Legacy Insurance Co., Ltd., must maintain certain solvency and liquidity margins and, in order to ensure continued compliance with the Act, it is necessary to support Legacy Insurance Co., Ltd. with a guarantee of its liabilities under the Act (the “Liabilities”) not to exceed Twenty-Five Million US dollars (US $25,000,000). Accordingly, Rent-A-Center DOES HEREBY GUARANTEE to you the payment in full of the Liabilities of Legacy Insurance Co., Ltd. and further to indemnify and hold harmless Legacy Insurance Co., Ltd. from the Liabilities up to the maximum dollar amount [$25,000,000] indicated in the foregoing paragraph. Seeking regulatory approval to treat DTAs as general business assets in subsequent years, Legacy, on October 30, 2003, petitioned the BMA and attached the parental guaranty. On November 12, 2003, the BMA issued a directive which “approved the Parental Guarantee from Rent-A-Center, Inc. dated 17th September, 2003 up to an aggregate amount of $25,000,000 for utilization as part of * * * [Legacy]’s capitalization”. This approval was granted for the years ending December 31, 2003, 2004, 2005, and 2006. Legacy used the parental guaranty only to meet the minimum solvency margin (i.e., to treat DTAs as general business assets).[11] On December 30, 2006, RAC unilaterally canceled the parental guaranty because Legacy met the minimum solvency margin without it. B. Legacy’s Ownership of RAC Treasury Shares Legacy purchased RAC treasury shares during 2004, 2005, and 2006. The BMA approved the purchases and allowed Legacy to treat the shares as general business assets for purposes of calculating its liquidity ratio (i.e., its ratio of general business assets to liabilities). Pursuant to Bermuda solvency regulations, an insurer fails to meet the liquidity ratio if the value of its general business assets is less than 75% of its liabilities. See Insurance Returns and Solvency Regulations, 1980, Appleby, Reg. 11(2). During the years in issue, Legacy met its liquidity ratio and did not resell the shares. C. Legacy’s Financial Reports For each policy period, Legacy’s auditor, Arthur Morris & Co. (Arthur Morris), prepared, and provided to RAC and the BMA, reports and financial statements. In these reports and statements, Arthur Morris calculated Legacy’s DTAs,[12] minimum solvency margin,[13] premium-to-surplus ratio,[14] and net underwriting income.[15] During each of the years in issue, Legacy’s total statutory capital and surplus equaled or exceeded the BMA minimum solvency margin. In calculating total statutory capital and surplus, Arthur Morris took into account the following four components: contributed surplus, statutory surplus, capital stock, and other fixed capital (i.e., assets deemed to be general business assets). During 2003, 2004, and 2005, Legacy included portions of the parental guaranty as general business assets. During the years in issue, the amounts of Legacy’s DTAs exceeded the portions of Legacy’s parental guaranty treated as general business assets. See table infra. Arthur Morris calculated Legacy’s statutory surplus by adding statutory surplus at the beginning of the year and income for the year, subtracting dividends paid and payable, and making other adjustments relating to changes in assets. The following table summarizes key details relating to Legacy’s policies: Parental Policy guaranty period Premium DTAs asset Total statutory capital & surplus Minimum Net solvency Premium-to- underwriting margin surplus ratio income 2003 $42,800,300 $5,840,613 $4,805,764 $5,898,192 $5,898,192 8.983:1 $1,587,542 2004 50,639,000 6,275,326 4,243,823 7,036,573 7,036,572 7.695:1 (982,000) 2005 54,148,912 7,659,009 3,987,916 8,379,436 8,379,435 6.369:1 8,411,912 2006 53,365,926 8,742,425 -0-10,014,206 9,284,601 6.326:1 8,810,926 2007 63,345,022 9,689,714 -0-12,428,663 10,888,698 5.221:1 10,933,022 2008 64,884,392 9,607,661 -0-23,712,022 11,278,359 2.538:1 18,391,392 IV. Procedural History Respondent sent petitioner, on January 7, 2008, a notice of deficiency relating to 2003; on December 22, 2009, a notice of deficiency relating to 2004 and 2005; and on August 5, 2010, a notice of deficiency relating to 2006 and 2007 (collectively, notices). In these notices, respondent determined that petitioner’s payments to Legacy were not deductible pursuant to section 162. On April 6, 2009, March 22, 2010, and September 29, 2010, respectively, petitioner, whose principal place of business was Plano, Texas, timely filed petitions with the Court seeking redeterminations of the deficiencies set forth in the notices. After concessions, the remaining issue for decision is whether payments to Legacy were deductible. OPINION In determining whether payments to Legacy were deductible, our initial inquiry is whether Legacy was a bona fide insurance company. See Harper Grp. v. Commissioner, 96 T.C. 45, 59 (1991), aff’d, 979 F.2d 1341 (9th Cir. 1992); AMERCO v. Commissioner, 96 T.C. 18, 40-41 (1991), aff’d, 979 F.2d 162 (9th Cir. 1992). We respect the separate taxable treatment of a captive unless there is a finding of sham or lack of business purpose. See Moline Props., Inc. v. Commissioner, 319 U.S. 436, 439 (1943); Harper Grp. v. Commissioner, 96 T.C. at 57-59. Respondent contends that Legacy was a sham entity created primarily to generate Federal income tax savings. I. Legacy Was Not a Sham. A. Legacy Was Created for Significant and Legitimate Nontax Reasons. After successfully resolving petitioner’s D&O insurance problem, Aon evaluated petitioner’s risk management department. Petitioner, with Aon’s assistance, improved risk management practices, switched from bundled to unbundled policies, and hired SRS as a third-party administrator. Aon proposed that petitioner form a captive, and petitioner determined that a captive would allow it to reduce its insurance costs, obtain otherwise unavailable insurance coverage, formalize and more efficiently manage its insurance program, and provide accountability and transparency relating to insurance costs. Petitioner engaged KPMG to prepare financial projections and evaluate tax considerations referenced in the feasibility study. Federal income tax consequences were considered, but the formation of Legacy was not a tax-driven transaction. See Moline Props., Inc. v. Commissioner, 319 U.S. at 439; Britt v. United States, 431 F.2d 227, 235-236 (5th Cir. 1970); Bass v. Commissioner, 50 T.C. 595, 600 (1968). To the contrary, in forming Legacy, petitioner made a business decision premised on a myriad of significant and legitimate nontax considerations. See Jones v. Commissioner, 64 T.C. 1066, 1076 (1975) (“A corporation is not a ‘sham’ if it was organized for legitimate business purposes or if it engages in a substantial business activity.”); Bass v. Commissioner, 50 T.C. at 600. B. There Was No Impermissible Circular Flow of Funds. Respondent further contends that Legacy was “not an independent fund, but an accounting device”. In support of this contention, respondent cites a purported “circular flow of funds” through Legacy, RAC, and RAC’s subsidiaries. Respondent’s expert, however, readily acknowledged that he found no evidence of a circular flow of funds, nor have we. Legacy, with the approval of the BMA, purchased RAC treasury shares but did not resell them. Furthermore, petitioner established that there was nothing unusual about the manner in which premiums and claims were paid. Finally, respondent contends that the netting of premiums owed to Legacy during 2003 is evidence that Legacy was a sham. We disagree. This netting was simply a bookkeeping measure performed as an administrative convenience. C. The Premium-to-Surplus Ratios Do Not Indicate That Legacy Was a Sham. Respondent emphasizes that, during the years in issue, Legacy’s premium-to-surplus ratios were above the ratios of U.S. property and casualty insurance companies and Bermuda class 4 insurers[16] (collectively, commercial insurance companies). On cross-examination, however, respondent’s expert admitted that his analysis of commercial insurance companies contained erroneous numbers. Furthermore, he failed to properly explain the profitability data he cited and did not include relevant data relating to Legacy. Moreover, his comparison, of Legacy’s premium-to-surplus ratios with the ratios of commercial insurance companies, was not instructive. Commercial insurance companies have lower premium-to-surplus ratios because they face competition and, as a result, typically price their premiums to have significant underwriting losses. They compensate for underwriting losses by retaining sufficient assets (i.e., more assets per dollar of premium resulting in lower premium-to-surplus ratios) to earn ample amounts of investment income. Captives in Bermuda, however, have fewer assets per dollar of premium (i.e., higher premium-to-surplus ratios) but generate significant underwriting profits because their premiums reflect the full dollar value, rather than the present value, of expected losses. Simply put, the premium-to-surplus ratios do not indicate that Legacy was a sham. D. Legacy Was a Bona Fide Insurance Company. Petitioner presented convincing, and essentially uncontra-dicted, evidence that Legacy was a bona fide insurance company. As respondent concedes, petitioner faced actual and insurable risk. Comparable coverage with other insurance companies would have been more expensive, and some insurance companies (e.g., Discover Re) would not underwrite the coverage provided by Legacy. In addition, RAC established Legacy for legitimate business reasons, including: increasing the accountability and transparency of its insurance operations, accessing new insurance markets, and reducing risk management costs. Furthermore, Legacy entered into bona fide arm’s-length contracts with petitioner; charged actuarially determined premiums; was subject to the BMA’s regulatory control; met Bermuda’s minimum statutory requirements; paid claims from its separately maintained account; and, as respondent’s expert readily admitted, was adequately capitalized. See Humana Inc. & Subs. v. Commissioner, 881 F.2d 247, 253 (6th Cir. 1989), aff’g in part, rev’g in part and remanding 88 T.C. 197, 206 (1987); Harper Grp. v. Commissioner, 96 T.C. at 59. Moreover, the validity of claims Legacy paid was established by SRS, an independent third-party administrator, which also determined the validity of claims pursuant to the Discover Re policies. See Harper Grp. v. Commissioner, 96 T.C. at 59. Finally, RAC’s subsidiaries did not own stock in, or contribute capital to, Legacy. II. The Payments to Legacy Were Deductible Insurance Expenses. The Code does not define insurance. The Supreme Court, however, has established two necessary criteria: risk shifting and risk distribution. See Helvering v. Le Gierse, 312 U.S. 531, 539 (1941). In addition, the arrangement must involve insurance risk and meet commonly accepted notions of insurance. See Harper Grp. v. Commissioner, 96 T.C. at 58; AMERCO v. Commissioner, 96 T.C. at 38. These four criteria are not independent or exclusive, but establish a framework for determining “the existence of insurance for Federal tax purposes.” See AMERCO v. Commissioner, 96 T.C. at 38. Insurance premiums may be deductible. A taxpayer may not, however, deduct amounts set aside in its own possession to compensate itself for perils which are generally the subject of insurance. See Clougherty Packing Co. v. Commissioner, 84 T.C. 948, 958 (1985), aff’d, 811 F.2d 1297 (9th Cir. 1987). We consider all of the facts and circumstances to determine whether an arrangement qualifies as insurance. See Harper Grp. v. Commissioner, 96 T.C. at 57. Respondent contends that payments to Legacy represent amounts petitioner set aside to self-insure its risks. A. The Policies at Issue Involved Insurance Risk. Respondent concedes that petitioner faced insurable risk relating to all three types of risk: workers’ compensation, automobile, and general liability. Petitioner entered into contracts with Legacy and Discover Re to address these three types of risk. Thus, insurance risk was present in the arrangement between petitioner and Legacy. B. Risk Shifting We must now determine whether the policies at issue shifted risk between RAC’s subsidiaries and Legacy. This requires a review of our cases relating to captive insurance arrangements. 1. Precedent Relating to Parent-Subsidiary Arrangements In 1978, we analyzed parent-subsidiary captive arrangements for the first time. See Carnation Co. v. Commissioner, 71 T.C. 400 (1978), aff’d, 640 F.2d 1010 (9th Cir. 1981). In Carnation, the parties entered into two insurance contracts: an agreement between Carnation and an unrelated insurer, and a reinsurance agreement between the captive and the unrelated insurer. Id. at 402-404. The unrelated insurer expressed concern to Carnation about the captive’s financial stability and requested a letter of credit or other guaranty. Id. at 404. Carnation refused to issue a letter of credit or other guaranty but did execute an agreement to provide, upon demand, $2,880,000 of additional capital to the captive. Id. at 402-404. We held, relying on Le Gierse, that the parent-subsidiary arrangement was not insurance because the three agreements (i.e., the two insurance contracts and the agreement to further capitalize the captive), when considered together, were void of insurance' risk. Id. at 409. The Court of Appeals for the Ninth Circuit affirmed and concluded that our application of Le Gierse was appropriate given the interdependence of the three agreements. See Carnation Co. v. Commissioner, 640 F.2d at 1013. Furthermore, the Court of Appeals held that “[t]he key was that * * * [the unrelated insurer] refused to enter into the reinsurance contract with * * * [the captive] unless Carnation” executed the capitalization agreement. See id. In Clougherty, our next opportunity to analyze a parent-subsidiary captive arrangement, the parties entered into two insurance contracts: an agreement between Clougherty and an unrelated insurer, and a reinsurance agreement between the captive and the unrelated insurer. Clougherty Packing Co. v. Commissioner, 84 T.C. at 952. We concluded that “the operative facts [17] jn the instant case * * * [were] indistinguishable from the facts in Carnation”, analyzed Clougherty’s balance sheet, and held that risk did not shift to the captive: We found in Carnation, as we find here, that to the extent the risk was not shifted, insurance does not exist and the payments to that extent are not insurance premiums. The measure of the risk shifted is the percentage of the premium not ceded. This is nothing more than a recharacterization of the payments which petitioner seeks to deduct as insurance premiums, [id. at 956, 958-959.] The Commissioner urged us to adopt his economic family theory, which posits that the insuring parent corporation and its domestic subsidiaries, and the wholly owned “insurance” subsidiary, though separate corporate entities, represent one economic family with the result that those who bear the ultimate economic burden of loss are the same persons who suffer the loss. To the extent that the risks of loss are not retained in their entirety by * * * or reinsured with * * * insurance companies that are unrelated to the economic family of insureds, there is no risk-shifting or risk-distributing, and no insurance, the premiums for which are deductible under section 162 of the Code. [Rev. Rul. 77-316, 1977-2 C.B. 53, 54.] In rejecting the Commissioner’s economic family theory, we emphasized that “[w]e have done nothing more in Carnation and here but to reclassify, as nondeductible, portions of the payments which the taxpayers deducted as insurance premiums but which were received by the taxpayer’s captive insurance subsidiaries.” See Clougherty Packing Co. v. Commissioner, 84 T.C. at 960. The Court of Appeals for the Ninth Circuit affirmed our decision in Clougherty and applied a balance sheet and net worth analysis, pursuant to which a determination of whether risk has shifted depends on whether a covered loss affects the balance sheet and net worth of the insured. See Clougherty Packing Co. v. Commissioner, 811 F.2d at 1305. In defining insurance, the Court of Appeals stated that “a true insurance agreement must remove the risk of loss from the insured party.” Id. at 1306. The Court of Appeals elaborated: [W]e examine the economic consequences of the captive insurance arrangement to the “insured” party to see if that party has, in fact, shifted the risk. In doing so, we look only to the insured’s assets, i.e., those of Clougherty, to determine whether it has divested itself of the adverse economic consequences of a covered workers’ compensation claim. Viewing only Clougherty’s assets and considering only the effect of a claim on those assets, it is clear that the risk of loss has not been shifted from Clougherty. [Id. at 1305.] Furthermore, the Court of Appeals explained that the balance sheet and net worth analysis does not ignore separate corporate existence: Moline Properties requires that related corporate entities be afforded separate tax status and treatment. It does not require that the Commissioner, in determining whether a corporation has shifted its risk of loss, ignore the effect of a loss upon one of the corporation’s assets merely because that asset happens to be stock in a subsidiary. Because we only consider the effect of a covered claim on Clougherty’s assets, our analysis in no way contravenes Moline Properties. [Id. at 1307.] Finally, the Court of Appeals concluded that “[t]he parent of a captive insurer retains an economic stake in whether a covered loss occurs. Accordingly, an insurance agreement between parent and captive does not shift the parent’s risk of loss and is not an agreement for ‘insurance.’ ” Id. 2. Precedent Relating to Brother-Sister Arrangements, In Humana Inc. & Subs. v. Commissioner, 88 T.C. at 206, we were faced with two distinct issues: the deductibility of premiums paid by a parent to a captive (parent-subsidiary arrangement) and the deductibility of premiums paid by affiliated subsidiaries to a captive (brother-sister arrangement). Humana, Inc. (Humana), operated a hospital network and, in 1976, was unable to renew its existing policies relating to workers’ compensation, malpractice, and general liability. Id. at 200. Humana’s, insurance broker could not obtain comparable coverage and recommended that Humana establish a captive insurance company. Id. Humana subsequently incorporated, and capitalized with $1 million, a Colorado captive. Id. at 201-202. The captive provided coverage relating to Humana and its subsidiaries’ workers’ compensation, malpractice, and general liability. Id. at 202-204. Humana paid the captive a monthly premium which was allocated among itself and each operating subsidiary. Id. at 203. We held that the parent-subsidiary premiums were not deductible because Humana did not shift risk to the captive. See id. at 206-207. The brother-sister arrangement, however, presented an issue of first impression. See id. at 208. We rejected the Commissioner’s economic family theory and held “that it is more appropriate to examine all of the facts to decide whether or to what extent there has been a shifting of the risk from one entity to the captive insurance company.” See id. at 214. We extended our rationale from Carnation and Clougherty (i.e., recharacterizing a captive insurance arrangement as self-insurance) to brother-sister arrangements and stated that declining to do so “would exalt form over substance and permit a taxpayer to circumvent our holdings by simple corporate structural changes.” See id. at 213. The report on which we relied, prepared by Irving Plotkin, stated: ‘“A firm placing its risks in a captive insurance company in which it holds a sole or predominant ownership position, is not relieving itself of financial uncertainty.’ ” Id. at 210 (fn. ref. omitted). In addition, the report stated: “True insurance relieves the firm’s balance sheet of any potential impact of the financial consequences of the insured peril. For the price of the premiums, the insured rids itself of any economic stake in whether or not the loss occurs. * * * [However] as long as the firm deals with its captive, its balance sheet cannot be protected from the financial vicissitudes of the insured peril.” [Id. at 211-212; alteration in original; fn. ref. omitted.] After quoting extensively from the report and analyzing the facts, “[w]e conclude[d] that there was not the necessary shifting of risk from the operating subsidiaries of Humana Inc. to * * * [the captive] and, therefore, the amounts charged by Humana Inc. to its subsidiaries did not constitute insurance.” See id. at 214. Seven Judges concurred with the opinion of the Court’s parent-subsidiary holding but disagreed with the brother-sister holding. See Humana Inc. & Subs. v. Commissioner, 88 T.C. at 219 (Korner, J., concurring and dissenting). They found the opinion of the Court’s rationale “disingenuous and entirely unconvincing” and asserted that the opinion of the Court had implicitly adopted the Commissioner’s “economic family” theory. Id. at 223. After emphasizing that the subsidiaries had no ownership interest in the captive, paid premiums for their own insurance, and would not be affected (i.e., their balance sheets and net worth) by the payment of an insured claim, the dissent further stated: The theory of Helvering v. Le Gierse, 312 U.S. 531 (1941), may have been adequate to sustain the holdings in Carnation and Clougherty, where only a parent and its insurance subsidiary were involved. It cannot be stretched to cover the instant brother-sister situation, where there was nothing' — equity ownership or otherwise — to offset the shifting of risk from the hospital subsidiaries to * * * [the captive]. If the majority is to accomplish the fell deed here, “a decent respect to the opinions of mankind requires that they should declare the causes which impel them” to such a result. [Id. at 224; fn. ref. omitted.] The Court of Appeals for the Sixth Circuit affirmed our decision relating to the parent-subsidiary arrangement, but reversed our decision relating to the brother-sister arrangement. [18] See Humana Inc. & Subs. v. Commissioner, 881 F.2d at 251-252. The Court of Appeals for the Sixth Circuit adopted the Court of Appeals for the Ninth Circuit’s balance sheet and net worth analysis and held that the subsidiaries’ payments to the captive were deductible. Id. at 252 (“[W]e look solely to the insured’s assets, * * * and consider only the effect of a claim on those assets[.]” (citing Clougherty Packing Co. v. Commissioner, 811 F.2d at 1305)). In rejecting our holding relating to the brother-sister arrangement, the Court of Appeals stated that “the tax court incorrectly extended the rationale of Carnation and Clougherty in holding that the premiums paid by the subsidiaries of Humana Inc. to * * * [the captive], as charged to them by-Humana Inc., did not constitute valid insurance agreements” and concluded that “[n]either Carnation nor Clougherty * * * provide[s] a basis for denying the deductions in the brother-sister * * * [arrangement].” Id. at 252-253. In response to our rationalization that “[i]f we decline to extend our holdings in Carnation and Clougherty to the brother-sister factual pattern, we would exalt form over substance and permit a taxpayer to circumvent our holdings by simple corporate structural changes”, the Court of Appeals stated: Such an argument provides no legal justification for denying the deduction in the brother-sister context. The legal test is whether there has been risk distribution and risk shifting, not whether Humana Inc. is a common parent or whether its affiliates are in a brother-sister relationship to * * * [the captive]. We do not focus on the relationship of the parties per se or the particular structure of the corporation involved. We look to the assets of the insured. * * * If Humana changes its corporate structure and that change involves risk shifting and risk distribution, and that change is for a legitimate business purpose and is not a sham to avoid the payment of taxes, then it is irrelevant whether the changed corporate structure has the side effect of also permitting Humana Inc.’s affiliates to take advantage of the Internal Revenue Code § 162(a) (1954) and deduct payments to a captive insurance company under the control of the Humana parent as insurance premiums. [Id. at 255-256.] The Court of Appeals held that “[t]he test to determine whether a transaction under the Internal Revenue Code § 162(a) * * * is legitimate or illegitimate is not a vague and broad ‘economic reality’ test. The test is whether there is risk shifting and risk distribution.” Id. at 255. The Court of Appeals further addressed our analysis and stated: The tax court cannot avoid direct confrontation with the separate corporate existence doctrine of Moline Properties by claiming that its decision does not rest on “economic family” principles because it is merely reclassifying or recharacterizing the transaction as nondeductible additions to a reserve for losses. The tax court argues in its opinion that such “recharacterization” does not disregard the separate corporate status of the entities involved, but merely disregards the particular transactions between the entities in order to take into account substance over form and the “economic reality” of the transaction that no risk has shifted. The tax court misapplies this substance over form argument. The substance over form or economic reality argument is not a broad legal doctrine designed to distinguish between legitimate and illegitimate transactions and employed at the discretion of the tax court whenever it feels that a taxpayer is taking advantage of the tax laws to produce a favorable result for the taxpayer. * * * The substance over form analysis, rather, is a distinct and limited exception to the general rule under Moline Properties that separate entities must be respected as such for tax purposes. The substance over form doctrine applies to disregard the separate corporate entity where “Congress has evinced an intent to the contrary” * * * [Humana Inc. & Subs v. Commissioner, 881 F.2d at 254.] In short, we do not look to the parent to determine whether premiums paid by the subsidiaries to the captive are deductible. Id. at 252. The policies shifted risk because claims paid by the captive did not affect the net worth of Humana’s subsidiaries. See id. at 252-253. 3. Brother-Sister Arrangements May Shift Risk. We find persuasive the Court of Appeals for the Sixth Circuit’s critique of our analysis of the brother-sister arrangement in Humana. First, our extension of Carnation and Clougherty to brother-sister arrangements was improper. As the Court of Appeals correctly concluded: “Carnation dealt solely with the parent-subsidiary issue, not the brother-sister issue. Likewise, Clougherty dealt only with the parent-subsidiary issue and not the brother-sister issue. Nothing in either Carnation or Clougherty lends support for denying the deductibility of the payments in the brother-sister context.” Id. at 253-254. Second, the opinion of the Court’s extensive reliance on Plotkin’s report to analyze the brother-sister arrangement was inappropriate. The report in Humana addressed parent-subsidiary, rather than brother-sister, arrangements. See Humana Inc. & Subs. v. Commissioner, 88 T.C. at 209; see also supra pp. 16-20. In the instant cases, Plotkin explicitly addressed brother-sister arrangements and stated: Even though the brother, the captive, and the parent are in the same economic family, to the extent that a brother has no ownership interest in the captive, the results of the parent-captive analysis do not apply. It is not the presence or absence of unrelated business, nor the number of other insureds (be they affiliates or non-affiliates), but it is the absence of ownership, the captive’s capital, and the number of statistically independent risks (regardless of who owns them) that enables the captive to provide the brother with true insurance as a matter of economics and finance. We agree. Humana’s subsidiaries had no ownership interest in the captive. See Humana Inc. & Subs. v. Commissioner, 88 T.C. at 201-202. Thus, the parent-subsidiary analysis employed by the opinion of the Court was incorrect. Third, we did not properly analyze the facts and circumstances. See id. at 214. The balance sheet and net worth analysis provides the proper analytical framework to determine risk shifting in brother-sister ’ arrangements. See Humana Inc. & Subs. v. Commissioner, 881 F.2d at 252; Clougherty Packing Co. v. Commissioner, 811 F.2d at 1305. Instead, we implicitly employed a substance-over-form rationale to recharacterize Humana’s subsidiaries’ payments as amounts set aside for self-insurance and referenced, but did not apply, the balance sheet and net worth analysis. Indeed, we did not “examine the economic consequences of the captive insurance arrangement to the ‘insured’ party to see if that party * * * [had], in fact, shifted the risk.” See Clougherty Packing Co. v. Commissioner, 811 F.2d at 1305. 4. The Legacy Policies Shifted Risk. In determining whether Legacy’s policies shifted risk, we narrow our scrutiny to the arrangement’s economic impact on RAC’s subsidiaries (i.e., the insured entities). See Humana Inc. & Subs. v. Commissioner, 881 F.2d at 252-253; Clougherty Packing Co. v. Commissioner, 811 F.2d at 1305 (“[W]e examine the economic consequences of the captive insurance arrangement to the ‘insured’ party to see if that party has, in fact, shifted the risk. In doing so, we look only to the insured’s assets[.]”). In direct testimony respondent’s expert, however, emphasized that petitioner’s “captive program * * * [did] not involve risk shifting that * * * [was] comparable to that provided by a commercial insurance program.” We decline his invitation to premise our holding on a specious comparability analysis. Simply put, the risk either was, or was not, shifted. The policies at issue shifted risk from RAC’s insured subsidiaries to Legacy, which was formed for a valid business purpose; was a separate, independent, and viable entity; was financially capable of meeting its obligations; and reimbursed RAC’s subsidiaries when they suffered an insurable loss. See Sears, Roebuck & Co. v. Commissioner, 96 T.C. 61, 100—101 (1991), aff’d in part, rev’d in part, 972 F.2d 858 (7th Cir. 1992); AMERCO v. Commissioner, 96 T.C. at 41. Moreover, a payment from Legacy to RAC’s subsidiaries did not reduce the net worth of RAC’s subsidiaries because, unlike RAC, the subsidiaries did not own stock in Legacy. Indeed, on cross-examination, respondent’s expert conceded that the balance sheets and net worth of RAC’s subsidiaries were not affected by a covered loss and that the policies shifted risk: [Petitioner’s counsel]: But if the loss gets paid, whose balance sheet gets affected in that case? [Respondent’s expert]: What’s hanging me up is that I don’t know whether — I guess you’re right, because * * * [RAC’s subsidiary] will treat the payment from — the payment that it expects from Legacy as an asset, so the loss would hit Legacy’s [balance sheet]. [Petitioner’s counsel]: But it wouldn’t hit * * * [RAC’s subsidiary’s] balance sheet. [Respondent’s expert]: I would think that’s right. * * * [Petitioner’s counsel]: Why is that not risk-shifting? [Respondent’s expert]: That’s an — why is that not risk-shifting? [Petitioner’s counsel]: Yes. Why is that not risk-shifting? Why hasn’t [RAC’s subsidiary] shifted its risk to Legacy? Its insurance risk — why hasn’t it shifted to Legacy in that scenario? [Respondent’s expert]: I mean, I would say from an accounting perspective, it has managed to have — is it — if we’re going to respect all these [corporate] forms, then it will have shifted that risk. 5. The Parental Guaranty Did Not Vitiate Risk Shifting. Legacy, in March 2003, petitioned the BMA and received approval, through December 31, 2003, to treat DTAs as general business assets. On September 17, 2003, RAC issued the parental guaranty to Legacy, which petitioned, and received permission from, the BMA to treat DTAs as general business assets through December 31, 2006. Respondent contends that the parental guaranty abrogated risk shifting between Legacy and RAC’s subsidiaries. We disagree. First, and most importantly, the parental guaranty did not affect the balance sheets or net worth of the subsidiaries insured by Legacy. Petitioner’s expert, in response to a question the Court posed during cross-examination, convincingly countered respondent’s contention: [The Court]: * * * [W]hat impact does the corporate structure have on the effect of the parental guarantee? [Petitioner’s expert]: I think it has a great impact on it. None of the subs, as I understand it, are entering in or [are] a part of that guarantee. Only the subs are effectively insureds under the policy. They are the only ones who produce risks that could be covered. The guarantee in no way vitiates the. completeness of the transfer of their uncertainty, their risk, to the insuring subsidiary. Even if one assumes that the guarantee increases the capital that the captive could use to pay losses, none of those payments would go to the detriment of the sub as a separate legal entity. Second, the cases upon which respondent relies are distinguishable. Respondent cites Malone & Hyde, Inc. v. Commissioner, 62 F.3d 835, 841 (6th Cir. 1995) (holding that a reinsurance arrangement was not bona fide because the captive was undercapitalized and the parent guaranteed the captive’s obligations to an unrelated insurer), rev’g T.C. Memo. 1993-585; Carnation Co. v. Commissioner, 71 T.C. at 404, 409 (holding that a reinsurance arrangement lacked insurance risk where the captive was undercapitalized and, at the insistence of an unrelated primary insurer, the parent agreed to provide additional capital); and Kidde Indus., Inc. v. United States, 40 Fed. Cl. 42, 49-50 (1997) (holding that a reinsurance arrangement lacked risk shifting because the parent indemnified the captive’s obligation to pay an unrelated primary insurer). Unlike the agreements in these cases, the parental guaranty did not shift the ultimate risk of loss; did not involve an undercapitalized captive; and was not issued to, or requested by, an unrelated insurer. Cf. Malone & Hyde, Inc. v. Commissioner, 62 F.3d at 841-843; Carnation Co. v. Commissioner, 71 T.C. at 404, 409; Kidde Indus., Inc., 40 Fed. Cl. at 49-50. Third, RAC guaranteed Legacy’s “liabilities under the Act [i.e., the Bermuda Insurance Act and related regulations]”, pursuant to which Legacy was required to maintain “certain solvency and liquidity margins”. RAC did not pay any money pursuant to the parental guaranty and Legacy’s “liabilities under the Act” did not include Legacy’s contractual obligations to RAC’s affiliates or obligations to unrelated insurers. For purposes of calculating the minimum solvency margin, Legacy treated a portion of the parental guaranty as a general business asset. See supra pp. 9-10. In sum, by providing the parental guaranty to the BMA, Legacy received permission to treat DTAs as general business assets and ensured its continued compliance with the BMA’s solvency requirements. [19] The parental guaranty served no other purpose and was unilaterally revoked by RAC, in 2006, when Legacy met the BMA’s solvency requirements without reference to DTAs. C. The Legacy Policies Distributed Risk. Risk distribution occurs when an insurer pools a large enough collection of unrelated risks (i.e., risks that are generally unaffected by the same event or circumstance). See Humana Inc. & Subs. v. Commissioner, 881 F.2d at 257. “By assuming numerous relatively small, independent risks that occur randomly over time, the insurer smoothes out losses to match more closely its receipt of premiums.” Clougherty Packing Co. v. Commissioner, 811 F.2d at 1300. This distribution also allows the insurer to more accurately predict expected future losses. In analyzing risk distribution, we look at the actions of the insurer because it is the insurer’s, not the insured’s, risk that is reduced by risk distribution. See Harper Grp. v. Commissioner, 96 T.C. at 57. A captive may achieve adequate risk distribution by insuring only subsidiaries within its affiliated group. See Humana Inc. & Subs. v. Commissioner, 881 F.2d at 257; Rev. Rul. 2002-90, 2002-2 C.B. 985. Legacy insured three types of risk: workers’ compensation, automobile, and general liability. During the years in issue, RAC’s subsidiaries owned between 2,623 and 3,081 stores; had between 14,300 and 19,740 employees; and operated between 7,143 and 8,027 insured vehicles. RAC’s subsidiaries operated stores in all 50 States, the District of Columbia, Puerto Rico, and Canada. RAC’s subsidiaries had a sufficient number of statistically independent risks. Thus, by insuring RAC’s subsidiaries, Legacy achieved adequate risk distribution. See Humana Inc. & Subs. v. Commissioner, 881 F.2d at 257. D. The Arrangement Constituted Insurance in the Commonly Accepted Sense. Legacy was adequately capitalized, regulated by the BMA, and organized and operated as an insurance company. Furthermore, Legacy issued valid and binding policies, charged and received actuarially determined premiums, and paid claims. In short, the arrangement between RAC’s subsidiaries and Legacy constituted insurance in the commonly accepted sense. See Harper Grp. v. Commissioner, 96 T.C. at 60. Conclusion The payments by RAC’s subsidiaries to Legacy are, pursuant to section 162, deductible as insurance expenses. Contentions we have not addressed are irrelevant, moot, or meritless. To reflect the foregoing, Decisions will be entered under Rule 155. Reviewed by the Court. Thornton, Vasquez, Wherry, Holmes, Buch, and Nega, JJ'., agree with this opinion of the Court. Goeke, J., did not participate in the consideration of this opinion. Respondent, in his amended answer, asserted an additional $2,603,193 deficiency relating to 2003. Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The following insurers provided coverage: U.S. Fidelity & Guarantee Co., Fidelity & Guaranty Insurance Co., Discover Property and Casualty Insurance Co., St. Paul Fire & Marine Co. of Canada, and Fidelity Guaranty Insurance Underwriters Inc. SRS was affiliated with the Hartford Insurance Co., a well-established insurer, and did not have a contract with Discover Re. RAC contributed $9.9 million of cash and received 120,000 shares of Legacy capital stock with a par value of $1. Legacy elected, pursuant to sec. 953(d), to be treated as a domestic corporation for Federal income tax purposes. In addition, Legacy engaged Aon Insurance Managers (Bermuda), Ltd., to monitor Legacy’s compliance with Bermudian regulations and to provide management, financial, and administrative services. The Bermuda Insurance Act, the Insurance Accounts Regulations, and the Insurance Returns and Solvency Regulations reference “general business”, “admitted”, and “relevant” assets. See Insurance Act, 1978, sec. 1, Appleby (2008) (Berm.); Insurance Accounts Regulations, 1980, Appleby, Schedule III, Pt. 1, 13 (Berm.); Insurance Returns and Solvency Regulations, 1980, Appleby, Reg. 10(3), 11(4) (Berm.). For purposes of this Opinion, there is no significant difference among these terms. From December 31, 2002, through September 12, 2003, Legacy incurred a $4,861,828 liability relating to claim reimbursements due petitioner. This amount was netted against petitioner’s September 12, 2003, premium payment (i.e., petitioner paid a net premium of $37,938,472 rather than the $42,800,300 gross premium). Each premium was generally paid in September of the year following the year in which the policy became effective. Use of the recurring item exception allowed petitioner to claim a premium deduction relating to the year in which the policy became effective, rather than the following year when the premium was actually paid. See sec. 461(h)(3)(A)(iii). On August 28, 2007, petitioner filed Form 3115, Application for Change in Accounting Method, requesting permission to revoke its use of the recurring item exception. See infra pp. 9-10. See infra pp. 9-10. See supra p. 6. See supra p. 7. Premium-to-surplus ratio is one measure of an insurer’s economic performance. On Legacy’s reports and statements, Arthur Morris referred to Legacy’s premium-to-surplus ratio as the “premium to statutory capital & surplus ratio”. For purposes of this Opinion, there is no significant difference between these terms. Net underwriting income equals gross premiums earned minus underwriting expenses. A class 4 insurance company may carry on insurance business, including excess liability business or property catastrophe reinsurance business. See Insurance Act, 1978, sec. 4E. Our Opinion emphasized that the “operative” facts related to the “interdependence of all of the agreements” as confirmed by the “execution dates”. See Clougherty Packing Co. v. Commissioner, 84 T.C. 948, 957 (1985), aff’d, 811 F.2d 1297 (9th Cir. 1987). We need not defer to the Court of Appeals for the Sixth Circuit’s holding because this matter is appealable to the Court of Appeals for the Fifth Circuit, which has not addressed this issue. See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff’d, 445 F.2d 985 (10th Cir. 1971). Legacy used a portion of the parental guaranty as a general business asset. See supra pp. 9-10. Legacy’s DTAs always exceeded the amount of the parental guaranty treated as a general business asset. See supra pp. 9-10.