T.C. Memo. 2018-86

UNITED STATES TAX COURT

RESERVE MECHANICAL CORP., f.k.a. RESERVE CASUALTY CORP.,
Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14545-16.                    Filed June 18, 2018.

Val J. Albright and Michelle Y. Ku, for petitioner.

Thomas F. Harriman, Naseem Jehan Khan, Grubert Roger Markley, and

Justin D. Scheid, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, Judge: Respondent determined the following deficiencies in

petitioner's Federal income tax for tax years 2008-10 (tax years in issue):

[*2]

| Year | Deficiency |
|------|------------|
| 2008 | $144,538 |
| 2009 | 164,418 |
| 2010 | 168,305 |

Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the tax years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

The issues for consideration are: (1) whether transactions that petitioner executed during the tax years in issue constituted insurance contracts for Federal income tax purposes, and therefore, whether petitioner was exempt from tax as an "insurance company" described in section 501(c)(15); (2) whether petitioner was eligible to make an election under section 953(d) to be treated as a domestic corporation; and (3) if petitioner was not an insurance company and was not eligible to make an election under section 953(d), whether payments that it received for the tax years in issue are subject to the 30% tax imposed by section 881(a).

**[*3]**                              FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts and the attached exhibits are incorporated herein by this reference.  When petitioner filed its petition, it was a corporation organized under the laws of Anguilla, British West Indies.  In our findings of fact we use the terms "insurance", "risk", "coverage", and similar terms to describe the form of the transactions, but our use of those terms does not reflect any ruling as a matter of fact or law with respect to insurance or insurance companies within the meaning of subchapter L of the Code.

I.      Overview of Reserve Mechanical Corp.

Reserve Mechanical Corp. f.k.a. Reserve Casualty Corp. (hereinafter, Reserve) was incorporated in Anguilla in 2008 under the provisions of section 9 of the Companies Act.  Anguilla is an overseas territory of the United Kingdom. During the tax years in issue Reserve held a Class B General Insurance License (Class B insurance license) issued by the Financial Services Commission of Anguilla.  The Financial Services Commission is the Anguillan governmental entity authorized to license, regulate, and oversee the financial services industry in Anguilla, including insurance companies.

During the tax years in issue Peak Casualty Holdings, LLC (Peak Casualty), a Nevada limited liability company, owned 100% of  Reserve's stock.  Norman L.

**[\*4]** Zumbaum and Cory Weikel each owned 50% of Peak Casualty. Zumbaum and Weikel were U.S. citizens who resided in Idaho during the tax years in issue.

Zumbaum and Weikel served as directors for Reserve. Zumbaum was its chief executive officer, president, treasurer, and assistant secretary. Weikel was its vice president, secretary, and assistant treasurer.

A.    Peak's Operations

Peak Mechanical & Components, Inc. (Peak), was incorporated in 1997, and its principal place of business was in Osburn, Idaho. Zumbaum and Weikel each owned 50% of Peak's outstanding stock, and Peak elected to be treated as an S corporation for Federal income tax purposes. Peak engaged in the business of distributing, servicing, repairing, and manufacturing equipment used for underground mining and construction. By 2008 Peak had grown significantly. In 2008 and 2009 it had 17 employees, including management personnel, shop managers and staff, and outside salespersons. In 2010 it had 13 employees.

Peak's facilities were in Idaho's Silver Valley, an active mining district, and were within the Bunker Hill Mining & Metallurgical Complex, a "Superfund Site" designated by the U.S. Environmental Protection Agency (EPA) (Bunker Hill Superfund Site). See Bunker Hill Mining & Metallurgical Complex, Smelterville, ID, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=

[*5] second.Cleanup&id=1000195#bkground (last visited June 13, 2018). The Bunker Hill Superfund Site was polluted with heavy metals, including zinc and lead, as a result of historic mining practices. The site was subject to EPA oversight and regulation. As part of its business Peak cleaned equipment used in polluted mines, and it took measures to protect its employees and to control fluid runoff containing pollutants and other hazardous materials.

During the tax years in issue Peak's equipment was used in approximately 12 mines in Idaho, Nevada, and Washington, and it sold some products outside the United States. It manufactured and serviced a line of submersible pumps used to remove groundwater from working areas, and it supplied and serviced large ventilation fans and air barrier doors, which are used to improve air quality and control air flow in underground mines. It rebuilt and customized trucks to be used as support vehicles in mining operations, and it manufactured and repaired guide wheels for hoist conveyances, which are used in mine shaft elevators.

B.    Peak's Commercial Insurance Coverage

During all of the tax years in issue Peak maintained insurance coverage with third-party commercial insurers. It held policies with third-party insurers that covered general liability, worker's compensation, commercial property, inland

**[*6]** marine, and international risk. It maintained the following policies with the following insurance companies:

| Insurance provider | Policy type & limit categories | Policy limits |
|---|---|---|
| Employers Mutual Casualty Co. (EMC) | General liability | |
| | Each occurrence | $1,000,000 |
| | Damage to rent premises | 100,000 |
| | Medical expense | 5,000 |
| | Personal & advertising injury | 1,000,000 |
| | General aggregate limit | 2,000,000 |
| | Products/completed operations aggregate limit | 2,000,000 |
| EMC | Commercial property | |
| | Blanket policy limit | 914,940 |
| EMC | Commercial inland marine (covering electronic data processing equipment) | |
| | Limit for hardware | 8,000 |
| Idaho State Insurance Fund | Worker's compensation employer's liability | |
| | Each accident | 100,000 |
| | Disease, each employee | 100,000 |
| | Disease, policy limit | 500,000 |
| Ace American Insurance Co. | International risk policy | |
| | Foreign general liability, automobile liability, employers liability | 1,000,000 |
| | Foreign accidental death & dismemberment | 5,000 |
| | Kidnap & extortion | 50,000 |

Peak also maintained auto insurance policies with State Farm for several vehicles that its employees drove.

[*7]   For tax year 2006 Peak claimed a deduction on its Form 1120S, U.S. Income Tax Return for an S Corporation, for insurance expenses of $38,810.  For tax year 2007 it claimed a deduction for insurance expenses of $95,828.  Peak's income statement reflects that for the first six months of 2008 it incurred insurance expenses of $57,300.

> C.     Peak's History of Losses and Insurance Claims and Potential Losses

Sometime before the tax years in issue Peak engaged a large accounting firm to review returns it had filed for previous years.  Peak was advised that its income had been underreported and that it needed to restate its income for three tax years.  It contacted the Internal Revenue Service (IRS) about restating its income, and it paid additional tax as a result.  The IRS waived penalties.

In years prior to the tax years in issue Peak had filed insurance claims under its auto insurance policies for losses associated with company vehicles.  In February 2008 a snowstorm damaged the roof of one of Peak's buildings, and it filed a claim with EMC.  EMC conducted an examination and concluded that the repair would cost $2,000.  Peak had a separate examination of the roof which concluded that $2,000 would be insufficient to repair the roof.  It tried to negotiate with EMC for a larger payout, but after negotiations EMC agreed to pay only $2,000.  Peak paid $25,000 out of pocket to have the roof replaced.

**[*8]**  D.  RocQuest and ZW Enterprises

During the tax years in issue Zumbaum and Weikel equally co-owned 100% of the membership interests in two other entities:  RocQuest, LLC (RocQuest), and ZW Enterprises, LLC (ZW).  RocQuest and ZW were Idaho limited liability companies that were treated as partnerships for Federal income tax purposes. RocQuest owned real estate in Osburn and Hayden Lake, Idaho, and Elko, Nevada.  It leased the properties in Osburn and Elko to Peak for Peak's business operations.  It leased the property in Hayden Lake to Premier Electric Motor, Inc. (Premier), an entity that Zumbaum and Weikel partially owned.  Premier conducted repair work on electrical motors and received most of its business from Peak.

ZW was an entity that Zumbaum and Weikel organized to facilitate a loan to an ex-employee.  After leaving Peak the ex-employee wanted to purchase a bar in Osburn, and Zumbaum and Weikel, through ZW, helped finance the purchase. ZW held a 10% ownership interest in the bar.  Zumbaum and Weikel organized ZW so that Peak would not have any liability vis-a-vis the bar.

II.  Formation of Reserve

Before forming Peak Zumbaum and Weikel worked for Mining Equipment, Ltd. (MEL), based in Colorado.  Robert Pope was the president and owner of

[*9] MEL. Zumbaum and Weikel viewed Pope as a mentor. Pope recommended that Peak should obtain more insurance, and he suggested forming a captive insurance company. He advised Zumbaum and Weikel to contact Capstone Associated Services, Ltd. (Capstone).

## A.    Overview of Capstone

In 1998 Stewart Feldman formed Capstone, a Texas limited partnership with an office in Houston, Texas.[1] Capstone offered insurance-related services, including captive feasibility studies, assistance with regulatory filings, accounting, and other services related to forming a captive insurance company. It offered a "turnkey" administrative program to help small and intermediate size captives overcome transaction costs.

Capstone employed insurance and accounting professionals, and it was closely affiliated with the Feldman Law Firm, LLP (Feldman firm), which provided legal services to Capstone clients. Feldman was the Feldman firm's managing partner and chief executive officer of Capstone's corporate general partner.

---

[1] Feldman testified that Capstone was a Texas limited partnership. Exhibit 9-J includes a reference to "Capstone Associated Services, Ltd., a Florida limited partnership".

[*10] Capstone would perform a feasability study for a client, which provided an opinion as to the advisability of establishing a captive insurance company. Generally, a feasibility study identified factors that would make a captive insurance arrangement desirable for a particular client, including a discussion of the client's business operations and risks, insurance coverage that the client held through third-party insurers, and potential coverage gaps ("exposures") that might be relevant to the client's business. For clients that proceeded with the formation of a captive insurance company, Capstone performed a comprehensive set of captive management and administrative services.

Capstone provided the services of its insurance professionals, and it assisted clients in selecting and administering policies that the captive entities issued. It advised clients in selecting policies, drafted policies, and provided services to handle claims adjustment and settlement. Capstone advised clients as to the premiums that should be charged for policies. It charged Reserve approximately $15,000 a quarter for services, including disbursements on Reserve's behalf.

B.    Onsite Visit of Peak's Operations

Zumbaum and Weikel contacted Capstone to discuss forming a captive insurance company. Peak provided documents relating to its business operations, which Capstone compiled as "Client Background Documents" for a feasibility

**[*11]** study. Peak provided financial and income statements, tax returns, and documentation of insurance policies that it held with third-party insurers. A copy of Rocquest's partnership tax return for 2007 was included with the background documents.

On August 13, 2008, Feldman and Lance McNeel, director of Capstone's insurance department, visited Peak's facilities. Feldman and McNeel met with Zumbaum and Weikel, and they toured locations where Peak conducted operations in Osburn and the facility in Hayden Lake. McNeel took pictures of Peak's operations and inventory. Feldman and McNeel discussed with Zumbaum and Weikel documents that Peak had provided and discussed products that Peak sold and its repair and manufacturing operations. They discussed possible gaps in Peak's existing insurance coverage. The onsite visit of Peak's facilities lasted six to eight hours.

C.     Feasibility Study for Peak

In August 2009 the finalized feasibility study for Peak was issued, about nine months after the start of Reserve's operations. The background documents compiled to support the feasibility study included documents that reflected Peak's financial information through August 31, 2009, and the background file was updated as late as December 14, 2009. Capstone's feasibility study for Peak

[*12] concluded that "as of the date of this report, the viability of a small captive insurer * * * to address the insurance and risk management issues discussed herein is feasible, reasonable, and practical, and is the best alternative risk mechanism option for the proposed insured ".

The feasibility study included an explanation of tax benefits for small and intermediate-size captives under sections 831(b) and 501(c)(15). It included a summary of Peak's business operations, a table reflecting Peak's commercial insurance policies, and a list of "other risk management issues". The study did not provide detailed information regarding the other risks that conventional insurance might not cover. The study provided brief descriptions of these risks, but it included no information on the probability that these risks might occur. The study did not include information about Rocquest and ZW. The study identified specific policies that Peak could consider handling through a captive insurer. It identified potential domiciles for Peak's small captive and concluded: "Anguilla is the preferred choice."

Capstone and Willis HRH of Houston (Willis), an insurance broker and risk management consulting firm that collaborated regularly with Capstone during the tax years in issue, jointly issued the feasibility study. Robert Snyder signed the study as senior vice president of Willis. McNeel was principal author of the study,

[*13] and Snyder's role was to review it. Snyder did not perform any independent investigation of Peak's business operations, and he based his review on the background documents that Capstone compiled and an oral briefing from McNeel.

D.  License Application & Organization

On October 10, 2008, Feldman wrote a letter to the Financial Services Commission of Anguilla notifying the commission that Capstone would be providing its "usual comprehensive set of captive administrative services" to Reserve. On October 21, 2008, Zumbaum, Weikel, and Feldman endorsed and submitted Reserve's Application For a Class B Insurer's License in Anguilla. The application contained a business plan for Reserve. The business plan stated that in its early years Reserve "is expected to be operated under section 501(c)(15) of the U.S. Federal Tax Code which limits gross receipts to $600,000".

On December 3, 2008, Reserve was incorporated in Anguilla, and on the same date the Financial Services Commission granted it a Class B insurance license valid through December 31, 2008. Reserve's insurance license application identified Capstone and Atlas Insurance Management (Anguilla) Limited (Atlas) as key service providers. On December 10, 2008, Reserve received an initial capitalization of $100,000, the minimum amount required for a Class B insurer under Anguillan law.

**[*14]** Capstone engaged Atlas to serve as the authorized representative and resident insurance manager for Capstone clients in Anguilla. Atlas transmitted documents that Capstone prepared for Reserve's license application to the Anguillan regulatory authorities. After Atlas submitted the license application, its principal role was to provide a local business address for Reserve.

III.     Reserve's Direct Written Policies

During the tax years in issue Reserve issued direct written insurance policies, with Peak, Rocquest, and ZW as the named insureds on each policy. All of the policies that Reserve issued the insureds showed one premium price and did not specify amounts to be paid by each insured. All of the policies contained the following provision:

> THE COVERAGES AFFORDED BY THIS POLICY ARE EXCESS OVER ANY OTHER VALID AND COLLECTIBLE INSURANCE POLICY ISSUED BY ANY OTHER INSURER * * *. THE LIMITS AND DEDUCTIBLES STATED HEREIN ONLY APPLY AFTER COVERAGE IS EXHAUSTED FROM ANY AND ALL OTHER VALID INSURANCE POLICIES ISSUED BY ANY OTHER INSURER.

During the tax years in issue Peak maintained its insurance coverage with third-party insurers.

For the tax years in issue Capstone selected and drafted the policies that Reserve issued for Peak and the other insureds. Zumbaum scanned the policies

[*15] but did not review them in detail, and he was unaware of specific terms in the policies. Capstone employees, including McNeel, determined the premiums that Reserve charged for the policies. For each of the tax years in issue McNeel prepared a rating worksheet that calculated the premiums for Reserve's direct written policies. Zumbaum and Weikel had ultimate authority to determine the premiums, and they always approved the amounts that Capstone advised.

McNeel calculated the premiums using ratings bases specific to Peak's business; for most policies the ratings base was Peak's annual projected sales. He applied to the ratings base for each policy a base rate that varied according to the type of insurance being provided, which yielded a base premium price for the first $250,000 of coverage. Capstone maintained a spreadsheet of base rates for "common policies" that it administered on behalf of its clients' captive insurance companies (Capstone entities). McNeel prepared the spreadsheet by reviewing the premiums that all Capstone entities had charged in previous years, and the spreadsheet provided both an average and a range of rates from which he could choose for each type of policy. On Reserve's rating worksheets McNeel adjusted the base premium amounts using increased limit factors, which accounted for the increased coverage limits in its policies.

[*16] Capstone engaged persons employed by an outside firm, Mid-Continent General Agency, Inc. (Mid-Continent), to develop premium quotations. A Mid-Continent employee generated pricing indications using information that Capstone compiled about its clients. McNeel relied on the Mid-Continent indications in setting the premiums that Reserve and other Capstone entities charged for their direct written policies.

In 2009 Mid-Continent wrote Capstone a letter which stated that "many of the insurance coverages written by the [Capstone] captives are nonstandard lines of insurance for which there is no 'manual rating'". The letter stated further that "[u]nderwriting judgment, while 'subjective,' is a key component of evaluating and pricing risk" in the methodology that Mid-Continent employees used to generate pricing indications. Peak and the other insureds under Reserve's policies had insufficient histories of insurance claims and losses to use as bases for determining premiums, and McNeel did not rely on loss data in calculating the premiums for Reserve's direct written policies.

## A.    2008 Direct Written Policies

For 2008 Reserve issued 13 direct written insurance policies, with Peak, RocQuest, and ZW as the named insureds. Each policy listed PoolRe Insurance Corp. (PoolRe) as the stop loss insurer. These policies were effective from

[*17] December 4, 2008, through January 1, 2009.  The aggregate amount of insurance was $13 million, and the premiums were $412,089.  Reserve issued the following direct written policies for 2008:

| Name of policy | Combined premium[1] | Aggregate policy limit |
| --- | --- | --- |
| Excess Directors & Officers Liability | $17,122 | $1,000,000 |
| Special Risk--Loss of Major Customer | 7,268 | 1,000,000 |
| Special Risk--Expense Reimbursement | 31,312 | 1,000,000 |
| Special Risk--Loss of Services | 4,874 | 1,000,000 |
| Special Risk--Weather Related Business Interruption | 7,268 | 1,000,000 |
| Excess Pollution Liability | 82,850 | 1,000,000 |
| Special Risk--Tax Liability | 65,408 | 1,000,000 |
| Excess Intellectual Property Package | 18,169 | 1,000,000 |
| Special Risk--Regulatory Changes | 64,899 | 1,000,000 |
| Special Risk--Punitive Wrap Liability | 55,233 | 1,000,000 |
| Excess Employment Practices Liability | 24,256 | 1,000,000 |
| Excess Cyber Risk | 28,343 | 1,000,000 |
| Special Risk--Product Recall | 5,087 | 1,000,000 |
| Total | 412,089 | 13,000,000 |

[1]As noted, each of the direct written policies that Reserve issued showed only one premium price for coverage to be provided to all three named insureds.  According to additional agreements executed by the parties, which are described in more detail below, a portion of the premiums due for the direct written policies were to be paid to a stop loss insurer.  It is unclear from the record which of the insureds paid premiums under the direct written policies, in what amounts they paid, and to whom.  Accordingly, the table reflects only the combined premium price shown on each of the policies.

**[*18]** Seven of the 2008 policies had retroactive dates or look-back provisions. The policies for excess directors and officers liability, excess pollution liability, excess intellectual property, punitive wrap liability, excess employment practices liability, and excess cyber risk provided that the policies would cover claims occurring after January 1, 2005.  The tax liability policy provided that it would cover all tax periods for tax returns whose due dates (without extensions) were during the 2008 calendar year.  The remaining six policies for loss of major customer, expense reimbursement, loss of services, weather-related business interruption, intellectual property package, regulatory changes, and product recall had no retroactive dates.

B.      2009 Direct Written Policies

For 2009 Reserve issued 11 direct written insurance policies.  Peak, RocQuest, and ZW were the named insureds, and the policies were effective for January 1, 2009, through January 1, 2010.  Each policy listed PoolRe as the stop loss insurer.  The total premiums were $448,127.  The direct written policies for 2009 did not include insurance for weather-related business interruption and excess cyber risk as included in the 2008 direct written policies. Reserve issued the following policies for 2009:

[*19]

| Name of policy | Combined premium | Aggregate policy limit |
|---|---|---|
| Excess Directors & Officers Liability | $17,075 | $1,000,000 |
| Special Risk--Loss of Major Customer | 50,625 | 500,000 |
| Special Risk--Expense Reimbursement | 26,686 | 1,000,000 |
| Special Risk--Loss of Services | 62,791 | 1,000,000 |
| Excess Pollution Liability | 60,750 | 500,000 |
| Special Risk--Tax Liability | 45,562 | 500,000 |
| Excess Intellectual Property Package | 34,425 | 1,000,000 |
| Special Risk--Regulatory Changes | 47,588 | 500,000 |
| Special Risk--Punitive Wrap Liability | 40,500 | 500,000 |
| Legal Expense Reimbursement | 26,687 | 1,000,000 |
| Special risk--Product Recall | 35,438 | 500,000 |
| Total | 448,127 | 8,000,000 |

On January 1, 2009, an Atlas employee executed the 2009 policies on Reserve's behalf. During 2009 Capstone formed its own licensed insurance management company in Anguilla, and Capstone replaced Atlas with its own employee to serve as Reserve's resident insurance manager and authorized representative.

C.    2010 Direct Written Policies

For 2010 Reserve issued 11 direct written policies. Peak, RocQuest, and ZW were the named insureds. Each policy listed PoolRe as the stop loss insurer. On January 1, 2010, a Capstone employee executed the policies as Reserve's

[*20] authorized representative.  The effective policy period for the 2010 policies was January 1, 2010, through January 1, 2011, and the total premiums were $445,314.  Reserve issued the following policies for 2010:

| Name of policy | Combined premium | Aggregate policy limit |
| --- | --- | --- |
| Excess Directors & Officers Liability | $17,075 | $1,000,000 |
| Special Risk--Loss of Major Customer | 47,812 | 500,000 |
| Special Risk--Expense Reimbursement | 23,024 | 1,000,000 |
| Special Risk--Loss of Services | 62,791 | 1,000,000 |
| Excess Pollution Liability | 60,750 | 500,000 |
| Special Risk--Tax Liability | 45,562 | 500,000 |
| Excess Intellectual Property Package | 34,425 | 1,000,000 |
| Special Risk--Regulatory Changes | 47,588 | 500,000 |
| Special Risk--Punitive Wrap Liability | 40,500 | 500,000 |
| Legal Expense Reimbursement | 30,349 | 1,000,000 |
| Special Risk--Product Recall | 35,438 | 500,000 |
| Total | 445,314 | 8,000,000 |

### D.    Claims Under Direct Written Policies

The only claim made under one of Reserve's direct written policies was made in 2009.  Peak made a claim under the policy for loss of a major customer.  The date of occurrence for the claim was January 5, 2009, according to a notice of claim filed on April 6, 2009.  The claim notice reported a reduction of orders from

[*21] Stillwater Mining Co. that reportedly resulted in a 16% reduction in Peak's sales for that period. The claim as reflected on the claim notice was for $164,820.

On April 21, 2009, Reserve issued Peak a check for $150,000. The check was drawn on Reserve's bank account at AmericanWest Bank in Wallace, Idaho. Jill Howard (Howard), a Peak employee, signed the check. On May 27, 2009, Reserve and Peak executed a settlement and release agreement in which Reserve agreed to pay the calculated value of $164,820 for Peak's loss of customer claim. On that date Reserve issued a second check, which Howard signed, from its AmericanWest bank account to Peak for $14,820. The claim notice indicates that on June 29, 2009, Reserve closed the claim for the Stillwater loss.

The claim notice states that Reserve reopened the claim for the Stillwater loss on account of extended losses on August 25, 2009. On September 10, 2009, a third check that Howard signed for $175,000 was issued from the AmericanWest bank account to Peak. After the tax years in issue, on January 30, 2012, Reserve and Peak executed an addendum to the settlement and release agreement, which stated that the amount to be paid in connection with the Stillwater loss was $339,820 and that the amount had been paid already. Reserve paid all amounts to Peak for the Stillwater loss out of its own funds.

**[\*22]** IV.  PoolRe, the Quota Share Arrangement, and the CreditRe Reinsurance Arrangement

A.  PoolRe's Stop Loss Endorsements

In 2008 PoolRe was domiciled in the British Virgin Islands.  Stephen Friedman was the owner of PoolRe.  In 2009 PoolRe redomiciled in Anguilla, and starting on April 15, 2009, and through 2010 it held a Class B insurance license in Anguilla.  PoolRe had no employees in Anguilla or in the United States.  Capstone administered PoolRe's operations and maintained the books and records for PoolRe.  Zumbaum was unaware of what Reserve did in Anguilla during the tax years in issue.

For each of the tax years in issue Reserve and PoolRe executed a Joint Underwriting Stop Loss Endorsement (stop loss endorsement), which by its terms applied to all of the direct written policies that Reserve issued.  Pursuant to the stop loss endorsements, PoolRe agreed to serve as a joint underwriter and stop loss insurer for the direct written policies.  Reserve was the lead insurer with respect to the policies, and PoolRe assumed an amount of excess risk.

According to the terms of the stop loss endorsement for each of the tax years in issue, PoolRe would receive a percentage of the total combined premiums due from the insureds under Reserve's direct written policies.  Pursuant to the

**[*23]** 2008 and 2009 stop loss endorsements, 81.5% of the premiums charged for the direct written policies was to be paid to Reserve as lead insurer, and the remaining 18.5% was to be paid to PoolRe as stop loss insurer. The terms of the 2010 stop loss endorsement were modified and provided that Reserve would receive 80.1% of the combined premiums under the direct written polices and PoolRe would receive 19.9%.

Under the terms of the stop loss endorsements for all tax years in issue, PoolRe's obligation to pay on claims made against Reserve's direct written policies arose only if a total claims threshold was exceeded, and according to the endorsements PoolRe was obligated to cover a certain amount of payments in excess of that threshold. The 2008 and 2009 stop loss endorsements provided that PoolRe would have no liability until claims reported under the direct written policies exceeded 100% of the total combined premiums due under the policies and one of four attachment points occurred.

Under the 2008 and 2009 stop loss endorsements attachment points were triggered when a certain number of losses reached a set amount. For example, the first attachment point described in the stop loss endorsements was reached when the lead insurer received two original loss claims for events of $100,000 or more, and the fourth attachment point was reached when the lead insurer received five

[*24] claims of $20,000 or more for separate events. PoolRe's participation level under the 2008 and 2009 stop loss endorsements, i.e., the total amount it might have to pay, was expressly limited to the lesser of: (1) the amount of the claim that exceeded the appropriate attachment point, (2) 150% of the combined direct written premiums, or (3) the named insureds' pro rata share of the total current year loss funding pool up to a maximum of 125% of the stop loss insurer's combined premium revenue from all current year stop loss coverage.

Under the modified 2010 stop loss endorsement PoolRe's liability to pay on claims made against Reserve's direct written policies arose when all reported claims exceeded 35% of total combined premiums. For reported claims above the 35% threshold the 2010 stop loss endorsement provided that PoolRe was liable to pay 50%, and PoolRe's participation level was limited to 100% of total combined premiums.

PoolRe entered into stop loss endorsements for insurance policies that other Capstone entities issued. During the tax years in issue PoolRe entered into endorsements for around 400 policies that between 51 and 56 Capstone clients issued and that covered in the aggregate around 150 insureds. The terms of the stop loss endorsements that PoolRe executed with Reserve and with the other Capstone entities were similar.

[*25] B.     Quota Share Policies

PoolRe pooled the premiums that it was entitled to receive under the stop loss endorsements, and it executed reinsurance agreements designed to redistribute them to the Capstone entities.  For each of the tax years in issue Reserve and the other Capstone entities each executed with PoolRe a Quota Share Reinsurance Policy (quota share policy).  Pursuant to their respective quota share policies Reserve and each of the other Capstone entities agreed to assume coverage for a specified portion (quota share) of the risks that PoolRe had assumed according to the terms of the stop loss endorsements (stop loss pool).

The quota share that Reserve assumed under the quota share policy for each tax year in issue was calculated so that Reserve was entitled to receive payments from PoolRe equal to the premiums that PoolRe was entitled to receive from Peak and the other insureds pursuant to the stop loss endorsement.  Pursuant to the stop loss endorsement for 2008 PoolRe was to receive premiums of $76,236, representing 18.5% of the total combined premiums that Peak and the other insureds were charged under the direct written policies.  Under the 2008 quota share policy PoolRe agreed to pay Reserve reinsurance premiums of $76,236 for assuming approximately 1.35% of PoolRe's stop loss pool.  Reserve's general ledger reflects that Reserve bore no losses under the quota share policy for 2008.

[*26] It reflects that Reserve received payments from PoolRe for the 2008 quota share policy that totaled $76,236, which were designated in the ledger as reinsurance premiums.

For 2009 and 2010 Reserve recorded no losses in connection with the quota share policies. Reserve's general ledger reflects that it received payments pursuant to the 2009 quota share policy of $82,903, which equaled the percentage of premiums that PoolRe was entitled to receive for the 2009 stop loss endorsement (i.e., 18.5% of $448,127) from Peak and the other insureds. PoolRe was due to receive premiums of $88,617 under the 2010 stop loss endorsement (i.e., 19.9% of $445,314) from Peak and the other insureds, and pursuant to the 2010 quota share policy PoolRe agreed to pay Reserve $88,617 for assuming about 1.44% of the stop loss pool.

C.    CreditRe Reinsurance Arrangement

For the tax years in issue Reserve executed with PoolRe a Credit Insurance Coinsurance Contract (coinsurance contract), under which Reserve agreed to assume a small portion of risk that PoolRe had agreed to assume from an unrelated company, CreditRe Reassurance Corp., Ltd. (CreditRe). Gary Fagg owned CreditRe, which had no employees. CreditRe had no knowledge of Reserve's formation or operations.

[*27] The coinsurance contracts recited that, pursuant to a preexisting reinsurance treaty, CreditRe ceded to PoolRe for the tax years in issue a pro rata share of the liability and premiums associated with a large pool of vehicle service contracts. According to statements in the coinsurance contracts, the vehicle service contracts in the pool originated from Lyndon Property Insurance Co. (Lyndon), a large U.S.-based direct writer of insurance. An exhibit prepared in connection with Reserve's Form 1024, Application for Recognition of Exemption Under Section 501(a), represents that Lyndon ceded the alleged vehicle contracts to ARIA (SAC), Ltd. (ARIA), a Bermuda-domiciled insurance company.

According to Fagg ARIA then ceded a portion of the liability for the vehicle service contracts to CreditRe, which ceded a small portion to PoolRe. The coinsurance contracts provided that PoolRe would cede shares of its portion of the liability for the vehicle service contracts to Reserve. The terms of the coinsurance contracts required Reserve to reinsure 0.9946%, 1.1576%, and 0.9100% of the annualized liability of PoolRe for the tax years in issue, respectively. PoolRe executed similar coinsurance contracts involving the vehicle services contracts with other Capstone entities during the tax years in issue.

**[*28]** V.    Reserve's Tax Returns

On its tax returns filed for the tax years in issue Reserve reported that it used the accrual method of accounting. For each of the tax years in issue Reserve elected to be treated as a domestic insurance company pursuant to section 953(d). For tax year 2008 it filed Form 990-EZ, Short Form Return of Organization Exempt From Income Tax, and for tax years 2009 and 2010 it filed Forms 990, Return of Organization Exempt From Income Tax.

On the Form 990-EZ for 2008 Reserve reported program service revenue of $481,589 and total expenses of $179,811. It reported a small amount of revenue attributable to investment income. All expenses reported for 2008 were "other expenses" and were detailed on an attached schedule. The attached schedule identified expenses for management and legal fees, office expenses, depreciation, travel, reinsurance commissions, and loss expenses.

On its 2009 Form 990 Reserve reported program service revenue of $524,627. It also reported revenue from investment income and "other revenue". For 2009 it reported total expenses of $517,514. Part IX, Statement of Functional Expenses, of the 2009 Form 990 listed expenses for management and legal fees, office expenses, depreciation, conferences, conventions, and meetings, reinsurance commissions, loss expenses, licenses and Government fees, and "other expenses".

[*29] On its 2010 Form 990 Reserve reported program service revenue of $511,314, and reported investment income and "other revenue". For 2010 it reported total expenses of $164,768. Part IX of the 2010 Form 990 listed expenses for management and legal fees, office expenses, depreciation, conferences, conventions, and meetings, reinsurance commissions, loss expenses, licenses and government fees, and "other expenses".

On August 31, 2009, Zumbaum submitted on behalf of Reserve a Form 1024, requesting recognition as a tax-exempt organization. At a later date Reserve withdrew its application.

VI.    Reserve's Financial Statements

For tax years 2009 and 2010 statutory financial statements required by and in compliance with Anguillan law were filed with the Financial Services Commission on Reserve's behalf.[2] Liptz & Associates (Liptz) prepared and filed these financial statements. David Liptz, a licensed certified public accountant, was head of Liptz, and he and his firm performed audits of Reserve for the tax years in issue. During the tax years in issue Reserve met the minimum solvency margin requirements under Anguillan law.

---

[2]The Anguilla Financial Services Commission waived the requirement to file an audited financial statement for 2008 because Reserve was not incorporated until the fourth quarter of that year.

**[*30]** VII.   Notice of Deficiency

On March 29, 2016, respondent issued Reserve a notice of deficiency for the tax years in issue (notice).  In the notice respondent determined that Reserve was not a tax-exempt insurance company within the meaning of section 501(c)(15).  Respondent determined that Reserve's insurance and reinsurance transactions lacked economic substance and in the alternative that it was not an insurance company within the meaning of subchapter L of the Code because its predominant activity was not insurance.

Respondent determined that Reserve was not eligible to make an election under section 953(d) to be treated as a domestic corporation and that Reserve was required to file Forms 1120-F, U.S. Income Tax Return of a Foreign Corporation, for the tax years in issue.  The notice stated that substitutes for returns had been prepared for Reserve for the tax years in issue.  The notice determined that the amounts that Reserve reported as program service revenue for the tax years in issue constituted taxable income.

The proposed tax liabilities in the notice were based on respondent's determination that the 30% withholding tax imposed by section 881(a) applied to income that Reserve received for the tax years in issue.  Respondent determined that because Reserve had failed to file Forms 1120-F for the tax years in issue

[*31] within 18 months of their respective due dates (as provided in section 6072) it was barred from claiming all deductions and credits in computing its taxable income.

OPINION

Generally, the taxpayer bears the burden of proving that the Commissioner's determinations set forth in the notice of deficiency are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Under section 7491(a) in certain circumstances the burden of proof may shift from the taxpayer to the Commissioner. Reserve does not contend that the burden of proof shifts to respondent under section 7491(a) as to an issue of fact.

Both parties presented experts to support their respective positions. We focus on the degree to which experts' opinions are supported by the evidence. We do not use titles because we do not wish to imply a greater deference to academic experts than to industry experts. We do not discuss the opinion of any expert which does not pertain to our factual conclusions.

I. Applicable Statutes

Section 501(a) and (c)(15) provides for the tax-exempt treatment of income received by insurance companies that meet certain criteria. An insurance company as defined in section 816(a) (other than a life insurance company) shall be exempt

[*32] from tax if (1) its gross receipts for the taxable year do not exceed $600,000 and (2) more than 50% of its receipts consist of premiums. Sec. 501(a), (c)(15)(A). Section 816(a) defines an insurance company as any company "more than half of the business of which during the taxable year is the issuing of insurance * * * or the reinsuring of risks underwritten by insurance companies."

Pursuant to section 953(d) a foreign insurance company that is a controlled foreign corporation, and which would qualify as an insurance company under subchapter L of the Code if it were a domestic corporation, may make an election to be treated as a domestic corporation for Federal income tax purposes. Reserve made an election under section 953(d) for the tax years in issue. It filed returns taking the position that it qualified as a tax-exempt insurance company under section 501(c)(15).

Generally, section 881(a) imposes a 30% tax on amounts received from sources within the United States by a foreign corporation as interest, dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, and other fixed or determinable annual or periodical gains, profits, or income. This withholding tax is limited to the amount not effectively connected with the conduct of a trade or business within the United States. Sec. 881(a).

**[*33]** II.    Insurance Requirements

Reserve contends that it was engaged in the business of issuing insurance and that it was a bona fide insurance company.  Respondent contends that Reserve was not an insurance company because its arrangement with Peak and the other insureds was not insurance.

Neither the Code nor the regulations define insurance, and we are guided by caselaw in determining whether a particular transaction constitutes insurance for Federal income tax purposes.  Avrahami v. Commissioner, 149 T.C. __, __ (slip op. at 49) (Aug. 21, 2017).  Courts have looked to four criteria in deciding whether an arrangement constitutes insurance:  (1) the arrangement involves insurable risks; (2) the arrangement shifts the risk of loss to the insurer; (3) the insurer distributes the risk among its policy holders; and (4) the arrangement is insurance in the commonly accepted sense.  Harper Grp. v. Commissioner, 96 T.C. 45, 58 (1991), aff'd, 979 F.2d 1341 (9th Cir. 1992); AMERCO & Subs. v. Commissioner, 96 T.C. 18, 38 (1991), aff'd, 979 F.2d 162 (9th Cir. 1992).  These four nonexclusive criteria establish a framework for determining the existence of insurance for Federal income tax purposes.  AMERCO & Subs. v. Commissioner, 96 T.C. at 38.  We consider all of the facts and circumstances in the light of the

**[\*34]** criteria outlined above. See Rent-A-Center, Inc. v. Commissioner, 142 T.C.

1, 13-14 (2014). We will first look at the criterion of risk distribution.

A.    Risk Distribution

Generally, risk distribution occurs when the insurer pools a sufficiently

large number of unrelated risks. Id. at 24. From the insurer's perspective

insurance is a risk-distribution device, a mechanism by which the insurer pools

multiple risks of multiple insureds in order to take advantage of the "law of large

numbers". R.V.I. Guar. Co. & Subs. v. Commissioner, 145 T.C. 209, 228 (2015).

Insuring many independent risks for numerous premiums serves to distribute risk.

Clougherty Packing Co. v. Commissioner, 811 F.2d 1297, 1300 (9th Cir. 1987),

aff'g 84 T.C. 948 (1985). Risk distribution allows the insurer to reduce the

possibility that a single claim will exceed the amount taken in as premiums and set

aside for the payment of such a claim. Id.

In past cases we have focused on both the number of insureds and the total

number of independent risk exposures to determine whether an insurer distributed

risk. See Avrahami v. Commissioner, 149 T.C. at __ (slip op. at 64). We have

held that a captive insurer may effectively distribute risk even though it insures

only the risks of its commonly owned brother-sister entities. See Rent-A-Center,

**[*35]** Inc. v. Commissioner, 142 T.C. at 24; Securitas Holdings, Inc. v. Commissioner, T.C. Memo. 2014-225, at *26-*27.

In Rent-A-Center, Inc. v. Commissioner, 142 T.C. at 24, we concluded that the captive assumed and pooled premiums for "a sufficient number of statistically independent risks" and achieved risk distribution because it issued policies for its affiliates that covered more than 14,000 employees, 7,100 vehicles, and 2,600 stores in all 50 States. We found that the captive in Securitas Holdings v. Commissioner, at *26-*27, distributed risk effectively where it provided worker's compensation coverage for more than 300,000 employees, automobile coverage for more than 2,200 vehicles, and other coverages for more than 25 separate entities. By contrast, in Avrahami v. Commissioner, 149 T.C. at __ (slip op. at 65), we found that the captive's issuance of seven types of direct policies covering exposures for four related entities was insufficient to distribute risk.

1. Direct Written Policies

During the tax years in issue Reserve issued between 11 and 13 direct written policies for three insureds. According to Reserve, one company, Peak, was the primary insured under all of the policies, even though the policies listed Peak, Rocquest, and ZW. Peak operated two facilities in Osburn, had a maximum of 17 employees, and maintained some machinery used to repair and fabricate

[*36] mining equipment. It sold or serviced equipment used in 12 mines, and it sold some equipment outside the United States.

The record establishes that the operations of the other two insureds were insignificant. Only one document relating to either of these entities was included with the background documents that Capstone used to produce the feasability study. Rocquest owned real estate in three locations, all of which it leased to Peak or another entity partly owned by Zumbaum and Weikel, and it had no employees. ZW had no employees and owned no assets other than a small interest in a local bar.

Reserve issued direct written policies for the tax years in issue that covered between $8 and $13 million in potential losses, and most or all of the risk of loss was associated with the business operations of just one insured. We conclude that the number of insureds and the total number of independent exposures were too few to distribute the risk that Reserve assumed under the direct written policies. Like the taxpayer in Avrahami, Reserve in this case failed to achieve risk distribution through the policies that it issued for its affiliated entities. See id.

### 2. The Reinsurance Agreements

Reserve contends that it distributed risk through the stop loss endorsements and the quota share policies with PoolRe. During the tax years in issue around 55

[*37] Capstone entities executed these same contracts with PoolRe, and these contracts were referred to as the quota share arrangement. Under the quota share arrangement PoolRe gave stop loss endorsements for the captives' direct written policies and agreed to assume an excess portion of the risks associated with those policies. Simultaneously, the captives agreed to reinsure, and to receive premiums for reinsuring, a share of blended risk from PoolRe's stop loss pool. Reserve contends that pursuant to the quota share arrangement it "insured hundreds of unaffiliated insureds under hundreds of unaffiliated insurance policies."

Reserve contends that it distributed risk through the coinsurance contracts. According to the terms of these contracts it assumed liability for a fraction of the pool of vehicle service contracts that CreditRe ceded to PoolRe for the tax years in issue. Reserve contends that through the coinsurance contracts it earned premiums for assuming risks "related to a large pool of many thousands of risks".

Because of the payments that PoolRe agreed to make pursuant to the quota share arrangement and the payments called for under the coinsurance contracts, Reserve contends that over 30% of its gross premiums for each of the tax years in issue was from providing insurance to unrelated parties. Reserve cites Harper Grp. in support of its argument that its percentage of nonaffiliated premium income is sufficient to satisfy the requirements of risk distribution. In Harper Grp.

**[*38]** v. Commissioner, 96 T.C. at 59-60, we determined that the captive insurer distributed risk because, in addition to insuring affiliated entities, the captive provided coverage to and collected premiums from a "relatively large number of unrelated insureds". We considered the percentage of the captive's gross premiums that was derived from unrelated insurance business, and we found that approximately 30% of the captive's business came from insuring unrelated parties. Id. We concluded that this fact demonstrated that the captive had "a sufficient pool of insureds to provide risk distribution." Id. at 60.

In cases where we held that the captive insurer achieved risk distribution by insuring a sufficient number of unrelated parties, we also determined that the transactions with the unrelated parties were insurance transactions for Federal income tax purposes. Avrahami v. Commissioner, 149 T.C. at __ (slip op. at 66); see also Harper Grp. v. Commissioner, 96 T.C. at 59-60; AMERCO & Subs. v. Commissioner, 96 T.C. at 39-42. Before we can determine whether Reserve effectively distributed risk through these agreements, we must determine whether PoolRe was a bona fide insurance company. See Avrahami v. Commissioner, 149 T.C. at __ (slip op. at 66-67). In determining whether an entity is a bona fide insurance company we have considered a number of factors, including:

(1)    whether it was created for legitimate nontax reasons;

[*39] (2)    whether there was a circular flow of funds;

(3)    whether the entity faced actual and insurable risk;

(4)    whether the policies were arm's-length contracts;

(5)    whether the entity charged actuarially determined premiums;

(6)    whether comparable coverage was more expensive or even available;

(7)    whether it was subject to regulatory control and met minimum statutory requirements;

(8)    whether it was adequately capitalized; and

(9)    whether it paid claims from a separately maintained account.

Id.; Rent-A-Center, Inc. v. Commissioner, 142 T.C. at 10-13. We address the most relevant factors in our analysis below.

PoolRe engaged in two sets of transactions during the tax years in issue: the quota share arrangement and the coinsurance contracts. We will consider the facts surrounding both in determining whether PoolRe was a bona fide insurance company.

### a.    Quota Share Arrangement

Capstone managed PoolRe, and only Capstone entities participated in the quota share arrangement. PoolRe had no employees. Reserve contends that PoolRe's stop loss pool was a mechanism whereby risks associated with the stop

[*40] loss endorsements were pooled and blended and that blended risk was ceded back to the Capstone entities. Reserve's expert Neil Doherty concluded that "virtually all the exposure assumed by any captive under the quota share reinsurance is entirely unrelated to the captive's affiliate".

Doherty explained that the pooled insurance risk of PoolRe is reinsured back to the Capstone captives on a proportional basis, which has the effect that the captives, such as Reserve, insure the smaller losses of their affiliates, but pool the larger losses so that each captive ends up bearing less than one-fiftieth of the larger loss. He concluded that this arrangement enabled Reserve to spread its risks across a large pool of unrelated parties, providing a wide distribution of risk.

Respondent contends that the quota share arrangement provided the appearance of risk distribution without actually distributing any risk. Respondent argues that PoolRe is not a bona fide insurance company because Reserve's arrangement with PoolRe did not distribute risk. Respondent argues that Reserve's arrangement with PoolRe did not distribute risk because PoolRe was not a bona fide insurance company.

i.      Circular Flow of Funds

Under its quota share policies Reserve was to receive reinsurance premiums equal to the direct written premiums that its affiliated insureds owed PoolRe under

**[*41]** the stop loss endorsements. Reserve never recorded and it does not contend that it had any losses or expenses in connection with its purported quota share liabilities. Accordingly, the end result for each tax year under the quota share arrangement was that Reserve would receive payments from PoolRe in exactly the same amount as the payments that PoolRe was entitled to receive from Peak and the other insureds for the stop loss coverage. In considering a very similar set of circumstances in Avrahami v. Commissioner, 149 T.C. at __ (slip op. at 68), we concluded that "[w]hile not quite a complete loop, this arrangement looks suspiciously like a circular flow of funds."

### ii. Arm's-Length Contracts

The perfect matching of payments under the corresponding stop loss endorsements and quota share policies (from insureds to PoolRe, and from PoolRe to captives) indicates that the quota share arrangement was not the product of arm's-length considerations. Peak's risks that were insured through PoolRe were different from the risks that PoolRe ceded to Reserve under the quota share policies. The risks that PoolRe purported to assume under the stop loss endorsements related to various unrelated business activities and to policies covering various unrelated lines of insurance. Reserve has not shown that the risks were comparable in scale.

[*42] The same amount that Peak and the other insureds were obligated to pay PoolRe for the stop loss coverage was to be paid to Reserve pursuant to the quota share arrangement. Reserve has not explained why these amounts were the same. It has not explained how all Capstone clients in the quota share arrangement would be able to transfer a particular set of risks (i.e., those associated with their affiliated insureds) and assume in exchange a blended portion of completely different risks for exactly the same premium price.

Reserve did not produce evidence which shows the risks of other Capstone entities. It did not provide evidence regarding their industries, locations, operations, types of risks, and exposure to risk. The evidence shows that the stop loss pool was divided among the captives so that reinsurance premiums equaled the portion of direct premiums paid by each captive's affiliated insureds. We conclude that the amounts that PoolRe was to pay Reserve under the quota share arrangement were not determined at arm's length or using objective criteria.

### iii. Actuarially Determined Premiums

According to a letter from Glicksman Consulting, LLC, to Capstone, PoolRe charges premiums that are a flat percentage of the gross direct written premiums. Reserve produced no evidence to support the calculation of the premiums. There is no evidence regarding the other Capstone entities that

[*43] participated in the quota share arrangement which shows the industries and the risks involved and the specific amounts of exposure.

According to the evidence, all participants in the quota share arrangement agreed to direct their affiliated insureds to pay the same percentage of direct written premiums to PoolRe. As in Avrahami v. Commissioner, 149 T.C. at __ (slip op. at 69), we are concerned with a one-size-fits-all rate for all the participants in the quota share arrangement.

### iv. Faced Actual and Insurable Risk

Under the terms of the direct written policies Reserve was liable for claims not covered by "any other valid and collectible insurance policy issued by any other insurer". Peak maintained extensive commercial insurance coverage with third-party insurers. Under the stop loss endorsements PoolRe was liable on claims made under the direct written policies only after a substantial claims threshold was exceeded.

Coverage under the stop loss endorsements was not triggered until claims reached 100% of total combined premiums in 2008 and 2009 and 35% of total combined premiums in 2010 (after which PoolRe would be obligated to pay 50% of claims made). The total combined premium amounts for the tax years in issue were $412,089, $448,127, and $445,314, respectively. Reserve could identify

**[*44]** only one occurrence before the tax years in issue when Peak tried to collect on an insurance claim with its third-party commercial insurers. EMC agreed to pay only $2,000 and Peak had to pay $25,000 for repairs to the damaged roof. This amount was significantly below the combined total premiums to be paid by the insureds for each tax year in issue and significantly below the claims threshold that would trigger PoolRe's liability under the stop loss endorsements.

Reserve cited the additional taxes that Peak paid after its returns were reviewed by an accounting firm, and it contends that this was a loss that the direct written policies and stop loss endorsements were designed to cover. However, Reserve provided no evidence of the amount of that purported loss or the likelihood that something like it would happen again. The available history of losses for Peak and the other insureds shows that before the tax years in issue they never suffered any losses that would even come close to triggering the stop loss coverage provided for in the stop loss endorsements. PoolRe was removed far from any actual risk associated with the business or operations of Reserve's insureds.

                                v.      <u>Licensed and Regulated as an Insurance Company</u>

Reserve provided evidence that PoolRe obtained a Class B insurance license after it redomiciled in Anguilla, starting April 15, 2009. However, it did not

[*45] provide evidence that PoolRe was a licensed and regulated insurer before that time. The record establishes only that PoolRe was a corporation in good standing in the British Virgin Islands before it reincorporated in Anguilla. Reserve executed both its 2008 and 2009 reinsurance agreements with PoolRe before it obtained an insurance license in Anguilla.

### vi. Created for Legitimate Nontax Reasons

Reserve contends that PoolRe, through the quota share arrangement, operated for the purpose of distributing risk for the Capstone entities. All the facts and circumstances in this case indicate that Reserve did not enter into the quota share arrangement with the intention of distributing its risk. For each of the tax years in issue the arrangement cycled a portion of the premiums that Peak paid under the direct written policies from one controlled entity to another, Reserve, and Reserve was not taxed on the income pursuant to section 501(c)(15). The only purpose PoolRe served through the quota share arrangement was to shift income from Peak to Reserve. Reserve has not established that PoolRe was created or operated for legitimate nontax reasons.

### vii. Conclusion

We conclude that the facts surrounding Reserve's quota share policies with PoolRe establish that those agreements were not bona fide insurance agreements.

[*46] The quota share arrangement involved a circular flow of funds. The premiums were not negotiated at arm's length. All the insureds of the participants in the quota share arrangement were obligated to pay the same percentage of premiums to PoolRe. There is no evidence that the premiums Peak and the other insureds were obligated to pay PoolRe and the premiums that PoolRe was obligated to pay Reserve were actuarially determined. PoolRe's activities as they relate to those policies were not those of a bona fide insurance company.

b.      Coinsurance Contracts

The risks associated with the coinsurance contracts purportedly related to a large pool of vehicle service contracts that a large insurance provider had originally underwritten. According to documents that Reserve provided and testimony of its witnesses, the liabilities for these vehicle service contracts were pooled and ceded down a chain of entities, and ultimately CreditRe ceded a portion of the pooled risk to PoolRe. The coinsurance contracts provided that PoolRe ceded portions of its liability for the vehicle service contracts to Reserve.

Reserve contends that liability for the pool of vehicle service contracts generated losses that offset premiums received during the tax years in issue. It failed to provide evidence that the vehicle service contracts, which formed the basis for the reinsurance that PoolRe re-ceded in the coinsurance contracts,

[*47] actually existed. Fagg described a series of ceding transactions (i.e., from Lyndon to ARIA, from ARIA to CreditRe, and from CreditRe to PoolRe). Even if we agree with Reserve about the validity of the coinsurance contracts, any actual risk that PoolRe had in connection with the vehicle service contracts was de minimis, because PoolRe assumed liability for a small, blended portion of the overall pool of vehicle service contracts, and it re-ceded most or all of that liability to the Capstone entities. The amount ceded to Reserve was also de minimis.

On the basis of the relevant facts and circumstances we conclude that the coinsurance contracts were not bona fide reinsurance agreements. Reserve has not established that the contracts underlying the purported reinsurance transactions existed or that the transactions involved actual risk.

### c. Conclusion

We conclude that PoolRe was not a bona fide insurance company. The purported reinsurance agreements between it and Reserve did not allow Reserve to effectively distribute risk. Neither through the policies it issued for its affiliated entities nor through its agreements with PoolRe did Reserve achieve risk distribution. Risk distribution is a necessary component of insurance, and its absence in this case is sufficient for us to conclude that Reserve's transactions during the tax years in issue were not insurance transactions. See Avrahami v.

[*48] Commissioner, 149 T.C. at __ (slip op. at 76); see also AMERCO & Subs. v. Commissioner, 96 T.C. at 40 (holding that risk-shifting and risk-distributing "are necessary to the existence of insurance" (citing Gulf Oil Corp. v. Commissioner, 89 T.C. 1010, 1023 (1987), aff'd, 914 F.2d 396 (3d Cir. 1990))).

B. Insurance in the Commonly Accepted Sense

The absence of risk distribution is enough to conclude that the transactions between Reserve and its insureds were not insurance transactions. An alternative ground for this holding is that they did not constitute insurance in the commonly accepted sense. See Avrahami v. Commissioner, 149 T.C. at __ (slip op. at 76). To determine whether an arrangement constitutes insurance in its commonly accepted sense we look at a number of factors, including whether the company was organized, operated, and regulated as an insurance company; whether it was adequately capitalized; whether the policies were valid and binding; whether the premiums were reasonable and the result of an arm's-length transaction; and whether claims were paid. R.V.I. Guar. Co. & Subs. v. Commissioner, 145 T.C. at 231; Rent-A-Center, Inc. v. Commissioner, 142 T.C. at 24-25; Harper Grp. v. Commissioner, 96 T.C. at 60.

Reserve contends that it was formed for a valid business purpose, the issuance of insurance contracts. It further contends that each of the contracts at

**[\*49]** issue meets all the requirements for an arrangement that constitutes insurance in the commonly accepted sense. In support of its argument Reserve contends that we should consider 39 determination letters that the Commissioner issued to other unrelated taxpayers concerning tax-exempt status under section 501(c)(15). Reserve contends that its captive insurance arrangement is similar to the 39 other arrangements for which the Feldman firm received approval of an application for tax-exempt status.

Respondent contends that Reserve did not provide insurance in the commonly accepted sense. Respondent further contends that Peak's premium payments to Reserve were made at the direction of Zumbaum and Weikel in order to reduce Peak's profits.

We will not rely upon the 39 determination letters in our consideration of whether Reserve offered insurance in the commonly accepted sense. These determinations cannot be used as precedent, see sec. 6110(k)(3), but they may be instructive for revealing the "interpretation put upon the statute by the agency charged with responsibility of administering the revenue laws", Hanover Bank v. Commissioner, 369 U.S. 672, 686 (1962).

**[*50]**        1.        Organization, Operation, and Regulation

Reserve was incorporated as an insurance company in Anguilla, and it was regulated by the Financial Services Commission of Anguilla. Generally, it complied with the requirements of Anguillan law. It obtained an insurance license, filed financial statements with regulators, satisfied minimum capitalization requirements, and maintained a business address in Anguilla. Apart from observing these formalities, however, the facts demonstrate that Reserve was not operated as an insurance company.

Reserve's planning, incorporation, and operations during the tax years in issue were managed entirely by Capstone. Reserve had no employees of its own that performed services. Zumbaum, Reserve's 50% owner, president, and chief executive officer, knew virtually nothing about its operations. At trial he showed very little knowledge of provisions in the policies that Peak and his other entities held with Reserve. Zumbaum did not know how claims were made or handled, and he did not know where or how Reserve's records were kept. Reserve's operations were managed at Capstone's direction. It maintained an address in Anguilla, but there is no evidence that any activities were ever performed there.

Other than the feasibility study that Capstone produced, there is no evidence that any due diligence was performed for the policies that Reserve issued. The

[*51] feasibility study gave an overview of Peak's operations, and some background documents relating to Peak's operations were attached to the feasibility study. However, many of the background documents covered periods after Reserve's incorporation. The feasibility study was not complete when Reserve issued the direct written policies for 2008 or 2009. The feasibility study did not provide details about the other insureds, Rocquest and ZW, and they were parties under every policy that Reserve issued. These two entities were named as insureds on policies that did not seem to apply to their limited activities.

There is no evidence that Reserve performed any due diligence with respect to the reinsurance agreements that it executed with PoolRe. With respect to the quota share arrangement it agreed to assume risks relating to a number of different businesses and a number of different lines of insurance. Nothing in the record indicates that Reserve or anyone performing activities on Reserve's behalf evaluated these risks before executing the quota share policies.

Capstone managed both Reserve and PoolRe, and they were both parties to the quota share policies and the coinsurance contracts. Reserve contends that the reinsurance agreements allowed it to distribute risk. However, Reserve did not show that anyone with a financial interest in its operations considered the details of the quota share policies and the coinsurance contracts and considered whether

[*52] risk was distributed. Zumbaum did not understand the details of Reserve's operations and relied upon Capstone's advice. There is no evidence that Reserve engaged in any due diligence to determine whether it was adequately distributing risk.

Only one claim was filed under Reserve's direct written policies. A claim notice was generated for the Stillwater loss, but no supporting documentation accompanied the claim notice. Peak did not submit and Reserve did not insist on obtaining any documents to substantiate the occurrence or the amount of the claimed loss. The first payment for the Stillwater loss was made out of Reserve's bank account more than a month before Reserve and Peak executed the settlement and release agreement. Peak received another large payment out of Reserve's bank account several months after the execution of the settlement and release agreement. Reserve did not execute an addendum to the settlement and release agreement reflecting this payment until years after the tax years in issue. All payments for the Stillwater loss were made by checks that Howard, a Peak employee, signed.

In considering whether Reserve operated as an insurance company, we "look beyond the formalities and consider the realities of the purported insurance transactions". Hosp. Corp. of Am. v. Commissioner, T.C. Memo. 1997-482, slip

[*53] op. at 59 (citing Malone & Hyde, Inc. v. Commissioner, 62 F.3d 835, 842-843 (6th Cir. 1995), rev'g T.C. Memo. 1989-604).  In reality the interested parties to Reserve's insurance transactions did not participate in structuring or executing those transactions; little or no due diligence was performed with respect to the direct written policies or the reinsurance agreements; and for all of the tax years in issue only one claim was filed under Reserve's policies, and that claim was handled in an irregular manner.  Capstone directed Reserve's activities and directed a series of transactions between its managed entities so that Reserve appeared to be engaged in the business of issuing insurance contracts.  The facts establish that Reserve was not operated as an insurance company in the commonly accepted sense.

## 2. Adequate Capitalization

During the tax years in issue Reserve met the minimum capitalization requirements of Anguilla.  Generally our caselaw holds that meeting the statutory requirements of the captive's domicile jurisdiction is sufficient to show that the captive was adequately capitalized.  See Avrahami v. Commissioner, 149 T.C. at __ (slip op. at 80-81); R.V.I. Guar. Co. & Subs. v. Commissioner, 145 T.C. at 231; Rent-A-Center, Inc. v. Commissioner, 142 T.C. at 13, 23-24; Harper Grp. v. Commissioner, 96 T.C. at 50, 60.

**[*54]**  3.  <u>Valid and Binding Policies</u>

To be valid and binding an insurance policy should, at a minimum, identify the insured, define an effective period for the policy, specify what is covered by the policy, state the premium amount, and be signed by authorized representatives of the parties.  See <u>Avrahami v. Commissioner</u>, 149 T.C. at __ (slip op. at 81); <u>Securitas Holdings v. Commissioner</u>, at *28.  In <u>R.V.I. Guar. Co. & Subs. v. Commissioner</u>, 145 T.C. at 231, we held that policies were valid and binding where the insureds filed claims for all covered losses and the captive paid them.

Generally, Reserve's direct written policies contained the necessary terms to make them valid and binding insurance, and they were signed by representatives of Reserve and the insureds.  We agree with respondent, however, that the direct written policies were "cookie cutter" policies.  The policies on their face indicate that they were the copyrighted material of Capstone, and Capstone employees testified at trial that they administered many of the same policies for all of their clients.  In many instances the policies were not reasonably suited to the needs of the insureds, particularly Rocquest and ZW, both of which had extremely limited operations.

Peak did file one claim under one of the direct written policies, and Reserve paid the claim.  However, the evidence of this claim that Reserve provided does

[*55] not show that either party performed due diligence to determine whether the claim was actually covered by the relevant policy. Payment of the claim on Reserve's behalf was handled by an employee of Peak. Evidence regarding the validity of Peak's policies is mixed, and we conclude it is a neutral factor.

4.      Reasonableness of Premiums

Reserve put forward experts to opine that the premiums charged for its direct written policies during the tax years in issue were reasonable. Capstone employees, particularly McNeel, were responsible for determining the premium amounts for the policies. Zumbaum and Weikel always approved the amounts that Capstone advised, and Zumbaum testified that he was aware that the amounts would generate substantial deductions for Peak.

In preparing the rating worksheets for Reserve's policies, McNeel used rating bases specific to Peak's business, and he applied base rates that were within ranges shown on Capstone's base rate spreadsheet. McNeel produced the base rate spreadsheet by reviewing the premiums that other Capstone entities had charged for various lines of coverage. Capstone obtained pricing indications from employees of Mid-Continent. McNeel testified that these indications were critical to Capstone's pricing methodology and were used to establish the base rates for policies shown on the base rate spreadsheet.

[*56] Despite the methodology that Reserve has shown Capstone used internally to calculate premiums, there are a number of factors which indicate that the premiums that the insureds were required to pay under the direct written policies were not reasonable in relation to the risk of loss. For 2007 Peak paid insurance expenses of $95,828. For 2008 Peak and two affiliates that had no active business operations were obligated to pay premiums of $412,089, and this was in addition to the premiums that Peak continued to pay for third-party commercial insurance. Reserve's policies covered only losses that were not covered by Peak's third-party policies. Peak's general liability policy with EMC had a policy limit of $2 million and covered several major categories of risks, including personal injury and products/completed operations liability.

Seven of the 2008 policies had retroactive dates. For 2008 the punitive wrap liability policy was retroactive, and it had a combined premium of $55,233 and a policy limit of $1 million. For both 2009 and 2010 the premium for the punitive wrap liability policy was $40,500 and the aggregate coverage was $500,000. Reserve provided no explanation as to why the policy limit was decreased to $500,000 and why a policy for four years with greater coverage cost only approximately $15,000 more than a policy for one year with half the coverage.

**[*57]** Six of the 2008 policies had no look-back provisions. For 2008 the regulatory changes policy had a policy period from December 4, 2008, to January 1, 2009, and the premium was $64,899 and the policy limit was $1 million. For both 2009 and 2010 the premium for the regulatory changes policy had a premium of $47,588 and a limit of $500,000. Reserve provided no explanation for why the limit was reduced from $1 million for one month of coverage to $500,000 for a year of coverage. It also provided no explanation why more was spent for one month of insurance coverage than a year of coverage.

Reserve contends that Peak was on a Superfund site and could have been exposed to pollution liability, for which no third-party coverage was available. Peak itself did not engage in mining practices that spread pollutants, and it already had systems in place to control the fluid runoff when it cleaned equipment used in polluted mines. In 2008 Peak had operated in Osburn continuously for over 10 years. Reserve provided no evidence that Peak had ever incurred costs during that time for excess pollution liability.

In his testimony Zumbaum indicated that EMC's refusal in 2007 to cover the full amount needed to repair Peak's damaged roof was a reason for obtaining additional insurance in 2008. He testified that Peak incurred a $25,000 expense to repair the roof, although no documentation was produced to substantiate the

[*58] amount of the loss. Zumbaum also testified about having to pay additional taxes for tax years prior to the tax years in issue. His testimony did not include how much additional tax was owed.

Despite Zumbaum's purported discontent with EMC's coverage, Peak subsequently kept its policies with EMC. Reserve has failed to explain why Peak would maintain its full set of third-party commercial insurance coverage, which it contends was insufficient, even after it paid roughly 400% more for additional coverage from Reserve. Zumbaum did not know which of Peak's policies with Reserve would have covered a loss like the one that was not covered by EMC in February 2008.

Zumbaum testified that in 2007 Peak's business was growing and that he expected it to continue growing during the next few years. He testified that he and Weikel had concerns about additional risks as the business grew. However, the rating worksheets that Capstone produced for calculating Reserve's premiums reflect that Peak's projected sales stayed the same for all of the tax years in issue. Peak actually had fewer employees in 2010 than it did in 2008.

Reserve contends that if one of Peak's products had failed then Peak would have been liable. There is no convincing evidence that legitimate concerns about this kind of liability should have been greater in 2008 than in previous years, and

[*59] during the tax years in issue Peak continued to maintain substantial commercial insurance coverage with third-party insurers. The feasibility study provided no information on the probability of a loss event that the direct written policies covered. It also did not explain in detail how the direct written policies would supplement Peak's existing insurance.

Peak filed only one claim under Reserve's policies during the tax years in issue, which occurred about one month after Reserve's incorporation. For the remainder of the tax years in issue Peak and the other insureds did not file any claims or report any additional losses. This supports our conclusion that any purported concerns about increased risks for the insureds were unfounded.

In cases involving brother-sister captive arrangements in which we determined that the premiums charged were reasonable, we have also found that the arrangement under scrutiny was undertaken principally to achieve a business purpose. See, e.g., Rent-A-Center, Inc. v. Commissioner, 142 T.C. at 3-5 (the principal objective of the arrangement was to reduce costs, improve efficiency, obtain otherwise unavailable coverage, and provide accountability and transparency); Securitas Holdings v. Commissioner, at *7-*8 (finding the captive insurance arrangement at issue provided more cost-effective insurance coverage than would have otherwise been available). Generally, we conclude that

[*60] premiums are reasonable when it can be shown that the amounts agreed upon by the parties were the result of arm's-length negotiations. See R.V.I. Guar. Co. & Subs. v. Commissioner, 145 T.C. at 231-232; Harper Grp. v. Commissioner, 96 T.C. at 60. In determining whether an arrangement constitutes insurance in the commonly accepted sense we consider more than whether the premiums chosen can be arrived at by actuarial means. We consider whether the facts demonstrate that the terms of the arrangement were driven by arm's-length considerations. See R.V.I. Guar. Co. & Subs. v. Commissioner, 145 T.C. at 234-235 (finding the subject policies constituted insurance in the commonly accepted sense because the policies' terms "correspond to, and are driven by, the characteristics and business needs of the underlying * * * transactions").

The facts do not reflect that Peak had a genuine need for acquiring additional insurance during the tax years in issue. There was no significant history of losses that would justify such a drastic increase, and Zumbaum's testimony that he was concerned about increased risks beginning in 2008 did not support a significant increase in insurance coverage. All the direct written policies included a provision that the coverage afforded by the policy would be valid only after insurance coverage from other insurers was exhausted. Peak had never come close to exhausting the policy limits of its third-party commercial insurance coverage.

[*61] With respect to premiums, the facts and circumstances of this case demonstrate that the direct written policies were not the result of arm's-length negotiations. Taking into consideration all the surrounding facts and circumstances, we conclude that no unrelated party would reasonably agree to pay Reserve the premiums that Peak and the other insureds did for the coverage provided by the direct written policies. Although Capstone calculated Reserve's premiums using objective criteria and what appear to be actuarial methods, the absence of a real business purpose for Reserve's policies leads us to conclude that the premiums paid for the polices were not reasonable and not negotiated at arm's length.

### 5. Payment of Claims

Reserve paid the one claim that Peak filed during the tax years in issue. As we noted in connection with other factors, the circumstances surrounding the payment of that claim were unusual. Although this factor weighs slightly in Reserve's favor, we do not regard the payments made in connection with the Stillwater loss as overwhelming evidence that Reserve's direct written or reinsurance policies constituted insurance in the commonly accepted sense.

**[*62]**     6.     Conclusion

Reserve was organized and regulated as an insurance company, and it satisfied the regulatory requirements of its domicile jurisdiction. It also paid a claim filed under one of its policies. However, it was not operated as a bona fide insurance company, and there was no legitimate business purpose for the policies that Reserve issued for the insureds. The direct written policies increased Peak's insurance coverage and expenses for the tax years in issue, when it also continued to hold policies with third-party insurers. In the light of all the facts and circumstances the premiums charged for the policies were unreasonable. We conclude that Reserve's transactions were not insurance transactions in the commonly accepted sense.[3]

III.     Taxability of Reserve's Revenue

We concluded that Reserve did not issue insurance or reinsurance contracts during the tax years in issue and therefore it did not receive more than 50% of its gross receipts from insurance premiums. See secs. 501(c)(15), 816(a). Because Reserve is not an insurance company, it is not eligible to make an election under section 953(d). Section 953(d) applies only to a foreign company which would

---

[3]Since we conclude Reserve's transactions were not insurance transactions, we do not need to address respondent's argument that Reserve's insurance and reinsurance arrangements lack economic substance.

**[*63]** qualify as an insurance company under subchapter L of the Code if it were a domestic corporation.  See sec. 953(d)(1)(B).

Because Reserve was not eligible to make an election under section 953(d), for the tax years in issue it should be treated as a foreign corporation.  See sec. 953(d).  For each of the tax years in issue Reserve reported the gross premiums for the direct written policies and the reinsurance agreements as program service revenue on Forms 990.  For each of the tax years in issue Reserve also reported revenue from investment income, and for 2009 and 2010 it reported "other revenue".

Section 881(a)(1) generally imposes a tax of 30% on "fixed or determinable annual or periodical" income (FDAP income) received by a foreign corporation from sources within the United States if the income is not effectively connected with the conduct of a U.S. trade or business.  FDAP income includes interest, dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, and emoluments.  Sec. 881(a)(1).  It includes all income included in gross income under section 61, except for items specifically excluded by the regulations.  Sec. 1.1441-2(b)(1)(i), Income Tax Regs.  The U.S. payors of FDAP income are generally required to deduct and withhold therefrom an amount equal to the tax imposed by sections 881.  See secs. 1441 and 1442.

**[\*64]** In the notice respondent determined that the amounts reported as Reserve's program service revenue were taxable as FDAP income from sources within the United States and were subject to the 30% withholding tax pursuant to section 881. Respondent conceded that the withholding tax should not apply to the amounts for the tax years in issue which Reserve contends were gross premiums received for the coinsurance contracts, which are $69,500, $76,500, and $66,000, respectively. Respondent maintains that the remainder of Reserve's self-reported program service revenue is taxable under section 881.

Reserve contends that if the payments it received for the tax years in issue were not for insurance, then amounts received from its affiliated insureds should be treated as contributions to capital or nontaxable advances or deposits. It contends that if we conclude that it had taxable revenue, then it is entitled to deductions in computing its taxable income.

Reserve bears the burden of showing that the income it received is not FDAP income as respondent determined in the notice. See Rule 142(a). Reserve did not produce evidence which showed that the amounts at issue are not FDAP income subject to the 30% tax. We reject Reserve's contention that the amounts it received during the tax years in issue were capital contributions or nontaxable deposits.

[*65] Zumbaum and Weikel capitalized Reserve shortly after its organization with $100,000, as required by Anguillan law. The record does not reflect that the parties to the purported insurance transactions treated or intended the amounts paid to Reserve as additional capital contributions. See Bd. of Trade v. Commissioner, 106 T.C. 369, 381 (1996) (holding that a payor's motive controls whether a payment is a contribution to capital). Reserve failed to specify why the payments might otherwise be treated as nontaxable deposits. There is no evidence indicating that the parties intended the payments as loans or gifts. See Neely v. Commissioner, 85 T.C. 934, 952 (1985) (holding that the most critical consideration in determining whether a transfer is a gift is the transferor's intention); Beaver v. Commissioner, 55 T.C. 85, 91 (1970) (holding that an essential element of a loan is that the recipient intends to make repayment and the person advancing the funds intends to enforce such repayment).

Reserve contends it should be allowed deductions for the tax years in issue. It bears the burden of proof on this issue. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). It contends that under section 1.882-4(a)(3)(ii), Income Tax Regs., it had reasonable cause for filing Forms 990 rather than Forms 1120-F.

**[*66]** However, even if Reserve established that it had reasonable cause for filing incorrect returns, we would not conclude that it is entitled to deductions. Section 1.882-4(b)(1), Income Tax Regs., provides generally that deductions are allowed to a foreign corporation only to the extent they are connected with gross income which is effectively connected, or treated as effectively connected, with the conduct of a trade or business in the United States. Reserve failed to establish that it was engaged in or received income treated as income effectively connected with a trade or business within the United States.

We sustain respondent's determination in the notice that for the tax years in issue Reserve had FDAP income from sources within the United States which is subject to the 30% tax under section 881. Reserve has not met its burden of proving its entitlement to any deductions.

To reflect the foregoing,

Decision will be entered

under Rule 155.